LABOR RELATIONS COMMISSION vs. FALL RIVER EDUCATORS' ASSOCIATION.

Bristol. October 8, 1980. — February 5, 1981.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Labor Relations Commission. Contempt. School and School Committee*, Contempt, Strike by teachers. *Labor*, Strike by teachers, Contempt. *Administrative Law*, Adjudicatory proceeding.

An investigation by the Labor Relations Commission under G. L. c. 150E, § 9A (*b*), is not an adjudicatory proceeding. [469-470]

It was proper for the Labor Relations Commission to conduct an investigation under G. L. c. 150E, § 9A (*b*), through one of its members designated as a hearing officer. [470]

At an investigatory hearing before the Labor Relations Commission under G. L. c. 150E, § 9A (*b*), there was sufficient evidence to warrant a finding that a teachers' union had encouraged and was engaged in a strike in violation of § 9A (*a*). [471]

The refusal of the officers of a teachers' union to testify at a hearing before the Labor Relations Commission under G. L. c. 150E, § 9A (*b*), warranted the drawing of an inference adverse to the union. [471-472]

It is within the authority of the Labor Relations Commission to reach conclusions in an investigation under G. L. c. 150E, § 9A (*b*), without establishing a formal record. [472-473]

In a proceeding under G. L. c. 150E, § 9A (*b*), the Labor Relations Commission had the authority to place certain affirmative obligations on a teachers' union found to be in violation of § 9A (*a*) and was not limited to issuing a cease and desist order. [473]

There was no error in finding a teachers' union in contempt of a temporary restraining order based on the failure of the union's officers and negotiating team members to comply with the order where the union's executive committee, who were the only individuals authorized by the union to act on its behalf, did nothing to disavow the conduct of the officers and negotiating team members. [474]

A fine for civil contempt of court may properly be imposed on a labor organization where, after an adjudication of contempt of court, the judge has announced that a fine will be imposed for each day of continued contempt of the court's order; and such a fine need not be

payable to a complaining litigant, need not be compensatory, and may properly be payable to the general fund of the Commonwealth. [474-476]

A school committee had no power to waive the imposition of a prospective, coercive fine on a teacher's union for civil contempt of court. [477-478]

Discussion of the standards to be applied in measuring the amount of a prospective, coercive fine imposed on a labor organization in a civil contempt proceeding and in finally fixing the amount of the fine. [478-484]

CIVIL ACTION commenced in the Superior Court Department on September 15, 1978.

The case was heard by *Taveira*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Brian A. Riley* for the defendant.

*Stuart A. Kaufman* for the plaintiff.

WILKINS, J. The Fall River Educators' Association (Association) appeals from a judgment that ordered the Association to pay $260,000 to the general fund of the Commonwealth, following an adjudication that the Association had been in contempt of an order of the Superior Court during thirteen days of a strike by Fall River public school teachers in September and October of 1978.

We agree with the determination that the Association was in contempt of an order of the Superior Court and that, when contempt of court has been found, a coercive, prospective order may properly be entered directing the payment to the Commonwealth of a fine for each day of future contempt of that court order. We conclude, however, that there should be further consideration of the amount of the fine in accordance with certain principles stated in this opinion.

A strike by the school teachers in Fall River commenced on September 11, 1978. Earlier, on September 6, 1978, anticipating that a strike was about to occur, the Fall River school committee petitioned the Labor Relations Commission (Commission) to make an investigation pursuant to G. L. c. 150E, § 9A (*b*). A hearing on the petition was

scheduled, by agreement, to commence on September 11. As a result of that hearing, the Commission concluded on September 14 that the Association and its members were engaged in a strike in violation of G. L. c. 150E, § 9A (a).[1] The Commission ordered the teachers to refrain from engaging in any strike and ordered the Association through its officers and negotiating team to stop encouraging the strike and to take various affirmative steps to disavow the strike publicly. The strike, however, continued.

On September 15, the Commission filed a complaint in the Superior Court seeking enforcement of its order. The Fall River school committee was permitted to intervene. The judge entered a temporary restraining order against the Association substantially along the lines requested by the Commission.[2] But the strike continued, and the Association

---

[1] General Laws c. 150E, § 9A, inserted by St. 1973, c. 1078, § 2, provides as follows:

"*Section* 9A. (a) No public employee or employee organization shall engage in a strike, and no public employee or employee organization shall induce, encourage or condone any strike, work stoppage, slowdown or withholding of services by such public employees.

"(b) Whenever a strike occurs or is about to occur, the employer shall petition the commission to make an investigation. If, after investigation, the commission determines that any provision of paragraph (a) of this section has been or is about to be violated, it shall immediately set requirements that must be complied with, including, but not limited to, instituting appropriate proceedings in the superior court for the county wherein such violation has occurred or is about to occur for enforcement of such requirements."

[2] The significant portions of that order read as follows:

"(b) The Fall River Educators' Association officers and negotiating team members shall cease and desist from inducing, encouraging, or condoning any strike, work stoppage, slowdown or withholding of services by employees of the Fall River School Committee.

"(c) The Fall River Educators' Association's officers and negotiating team members shall take the following affirmative action:

"1. Publicly disavow any strike, work stoppage, slowdown or withholding of services by employees of the Fall River School Committee.

"2. Call a meeting of its membership on or before September 17, 1978 during non-school hours and shall notify the members of the contents of this Order and disavow any strike, work stoppage, slowdown or withholding of services by employees of the Fall

failed to comply with the judge's order. On September 18, the Commission filed a petition for contempt. On September 20, a hearing was held, and on that day the judge found the Association to be in civil contempt of court by reason of its failure to comply with certain portions of the temporary restraining order.[3] The judge ordered the entry of a preliminary injunction substantially in the form of the temporary restraining order. He further ordered that the Association pay to the clerk of court a fine of $20,000 a day, commencing on the next day, September 21. Although the order did not say so explicitly, the parties correctly construe the direction to pay the daily fine as conditioned on the strike continuing.

The strike ended on October 4, 1978, when an agreement was entered into between the Association and the school committee. In that agreement, the school committee waived any claim for damages arising from the "alleged work stoppage," agreed not to seek collection of any damages out of any fines imposed in the Commission's action, and agreed to withdraw from that action. On October 10, the judge dissolved the preliminary injunction and ordered that a fine of $260,000 was payable pursuant to his order of September 20, representing $20,000 for each day of the violation of the preliminary injunction (September 21 through October 3).

On January 11, 1979, after hearing argument on the parties' cross motions, the judge granted summary judgment for the Commission. Subsequently, the case was heard on the Association's motion to reduce or revoke the fines and on the Commission's motion for entry of judgment and for taxation of costs and counsel fees. In ruling on these motions,

River School Committee.

"3. Announce to the media that the officers and negotiating team members of the Fall River Educators' Association disavow any strike, slowdown, work stoppage or withholding of services by employees of the Fall River School Committee and make known the contents of this Order."

[3] He cited the paragraphs of the temporary restraining order set forth in the next prior footnote.

the judge filed an extensive and carefully considered memorandum of decision. He dealt with the Association's various challenges to the lawfulness of the Commission's order and with the Association's claim that the payment of a fine to the Commonwealth is not lawful in the circumstances.[4] He ordered entry of judgment for the Commission in the amount of $260,000 but declined to allow interest on the amount awarded. The Commission has not appealed from the determination not to allow interest.

1. We consider first the Association's challenges to the Commission's order of September 14. None of them is meritorious.[5]

a. The Commission's investigation under G. L. c. 150E, § 9A (b), was not an adjudicatory proceeding as defined in G. L. c. 30A, § 1 (1), and thus the various requirements of the State Administrative Procedure Act for adjudicatory hearings did not apply to the Commission's investigatory

---

[4] The Association agreed that it was properly chargeable for the Commission's costs and attorneys' fees, in the amount of $2,240.

[5] The parties have assumed that the temporary restraining order, the preliminary injunction, and the order assessing a civil contempt fine are lawful only if the underlying agency order was valid. It has been held that a civil contempt adjudication based on a violation of an unlawful court order cannot stand. See *Fitchburg* v. *707 Main Corp.*, 369 Mass. 748, 754 (1976); *Stow* v. *Marinelli*, 352 Mass. 738, 744-745 (1967), and cases cited. We shall assume with the parties, but do not decide, that a valid Commission order was an indispensible underpinning of the order of September 20 assessing a prospective fine of $20,000 for each day the strike thereafter continued, of the temporary restraining order, and of the final judgment. Compare *Latrobe Steel Co.* v. *United Steelworkers Local 1537*, 545 F.2d 1336, 1345-1348 (3d Cir. 1976) (a coercive civil contempt order does not survive if the underlying injunction is invalid), with *Inland Steel Co.* v. *Local 1545, United Mine Workers*, 505 F.2d 293, 296-297 (7th Cir. 1974), overruled on other grounds in *Zeigler Coal Co.* v. *Local 1870, United Mine Workers*, 566 F.2d 582 (7th Cir. 1977) (a coercive contempt order may, like a criminal contempt order, survive the invalidation of the underlying injunction). We note, however, that the judge's finding on September 20 that the Association was encouraging and engaged in an unlawful strike might independently justify the entry of the preliminary injunction issued that day and perhaps also the entry of the order setting forth a prospective, coercive, daily fine and the entry of final judgment.

hearing. An adjudicatory proceeding is one in which a statutory or constitutional direction dictates an agency hearing. See *Reid* v. *Acting Comm'r of Dep't of Community Affairs*, 362 Mass. 136, 144 (1972). There is no statutory requirement for a hearing in the course of an investigation under § 9 (*b*). The fact that the Commission has the authority, under G. L. c. 150E, § 9A (*b*), to "set requirements that must be complied with" does not make the agency proceeding an adjudicatory one. *Department of Pub. Health* v. *Cumberland Cattle Co.*, 361 Mass. 817, 828-829 (1972). Nor is there any constitutional right to an agency hearing where an agency is simply conducting an investigation that may result in the agency's commencing a judicial proceeding.

b. The Association raises for the first time on appeal a claim that it was improper for the Commission to conduct the § 9A (*b*) investigation through one of its members designated as a hearing officer. Even if we were to overlook the late raising of this argument, it has no valid basis. By G. L. c. 23, § 9Q, inserted by St. 1938, c. 345, § 1, the Commission is authorized to "prosecute any inquiry necessary to its functions in any part of the commonwealth" through one or more of its members or an agent or agency. Any member who participates in such an inquiry is not disqualified from participation in the Commission's decision in the case. *Id.* The fact that it is expressly provided that a member or agent of the Commission may conduct adjudicatory hearings under G. L. c. 150E (see §§ 4 and 11) does nothing to undercut the Commission's right to conduct a § 9A (*b*) investigation through a hearing officer. It would be anomalous for the Commission to be authorized to conduct an adjudicatory hearing through a hearing officer and not be able to conduct an investigation through such an officer.[6]

---

[6] The Commission's order of September 14 was signed by a majority of the Commission members. See G. L. c. 4, § 6, Fifth.

c. The evidence before the hearing officer amply warranted the conclusion that the Association encouraged and was engaged in a strike. The Association concedes that the teachers were engaged in a strike. It argues, however, that the evidence does not warrant the conclusion that the Association was involved.

The evidence at the investigatory hearing showed that almost all the city's teachers had failed to report on each day of the strike. On September 11, 1978, approximately fifteen people in a staff of 950 reported for work. Only about ten reported on September 12, and five reported on September 13. The officers and negotiating committee members of the Association failed to report to work and had no recorded excuse for not appearing. The secretary of the Association was shown in a photograph of a picket line at one of the schools. One photograph showed a sign, held by an apparent picket, which read "FREA on Strike." Another sign said "Support your F.R.E.A." A reasonable inference that the Association was involved in encouraging the strike was warranted, if not compelled, from this evidence.

The refusal of the Association's officers, called as witnesses by the school committee, to testify before the hearing officer, because of the possibility of later criminal or civil proceedings against them, warranted the drawing of an inference adverse to the Association. In a civil action, a reasonable inference adverse to a party may be drawn from the refusal of that party to testify on the grounds of self-incrimination. See *Kaye* v. *Newhall*, 356 Mass. 300, 305-306 (1969); *McCooe* v. *Dighton, Somerset, & Swansea St. Ry.*, 173 Mass. 117, 119 (1899); *Andrews* v. *Frye*, 104 Mass. 234 (1870); *Baxter* v. *Palmigiano*, 425 U.S. 308, 316-320 (1976); 8 J. Wigmore, Evidence § 2272 (1) (e) (McNaughton rev. 1961); W.B. Leach & P.J. Liacos, Massachusetts Evidence 160 (4th ed. 1967). The fact that the inference is drawn against one who, in a civil case, is opposing the finding of a contested question of fact, rather than one seeking to prove it, makes no difference, especially in this case where the actions of the Association were peculiar-

ly within the knowledge of its officers. See *Baxter* v. *Palmigiano, supra* at 318; *Mahne* v. *Mahne,* 66 N.J. 53, 60-62 (1974); *Molloy* v. *Molloy,* 46 Wis.2d 682, 686-688 (1970); Kaminsky, preventing Unfair Use of the Privilege Against Self-Incrimination in Private Civil Litigation: A Critical Analysis, 39 Brooklyn L. Rev. 121, 148-149 (1972). Indeed, a reasonable rule might put the burden on the Association to come forward with evidence that it was not encouraging the strike, once, as in this case, the nearly unanimous participation of the Association's members in the strike was established. The refusal of the Association's officers to testify when called, on a subject peculiarly within their knowledge and responsibility, reasonably warranted an inference, in this civil action, adverse to the Association itself. *E.H. Boerth Co.* v. *LAD Properties,* 82 F.R.D. 635, 645 (D. Minn. 1979) (inferences against employer warranted where key employee claimed his Fifth Amendment privilege). *Ralph Hegman Co.* v. *Transamerica Ins. Co.,* 293 Minn. 323, 325-326 (1972) (inference adverse to surety warranted where principal asserts privilege against testifying). 39 Brooklyn L. Rev., *supra* at 146 n.127, 152-153. Note, Use of Privilege against Self-Incrimination in Civil Litigation, 52 Va. L. Rev. 322, 332 (1966).[7]

We have dealt with the question of the adequacy of the evidence presented to the hearing officer as if it were essential that evidence on the record support the agency's action.

---

[7] At the investigatory hearing, the Association did not contest the summoning of its officers to testify. At the trial level, the Association belatedly asserted the absence of any authority to subpoena its officers. We need not consider the untimely argument.

The Commission does not cite any authority for issuing subpoenas in a § 9A (*b*) investigation. If it has no authority to issue subpoenas in such a case, it may wish to seek appropriate legislation. On the other hand, a hearing officer would be warranted, in any event, in drawing an inference adverse to an employee organization from its failure to present information from its officers or other persons available to it (in this case, the officers were present at the hearing) who were particularly informed about the degree of the organization's participation in a strike. See *Commonwealth* v. *United Food Corp.,* 374 Mass. 765, 771-772 (1978); *Grady* v. *Collins Transp. Co.,* 341 Mass. 502, 504-506 (1960); W.B. Leach & P.J. Liacos, Massachusetts Evidence 199-200 (4th ed. 1967).

It should be remembered that § 9A (*b*) calls for an investigation, not an evidentiary hearing. We think it is within the Commission's authority to reach conclusions in a § 9A (*b*) investigation without establishing a formal record. Section 9A deals with situations often requiring prompt action in response to an unlawful strike by public employees. The agency in its discretion may well call for a full, open hearing, but such a hearing is not mandated. If it is essential, in support of a subsequent judicial order, that a Commission order have been entered at a time when a strike was occurring or about to occur, it would be sufficient to prove that fact in the course of any subsequent judicial proceeding. Proof of this character was made at the September 20 hearing on the Commission's contempt complaint.

d. The Commission was warranted in placing certain affirmative obligations on the Association and was not limited, as the Association argues, to issuing a cease and desist order. Section 9A (*b*) directs the Commission to "set requirements that must be complied with." Although the Commission could not direct the Association to surrender its legal rights (*Director of the Div. of Employee Relations of the Dep't of Administration & Fin.* v. *Labor Relations Comm'n*, 370 Mass. 162 [1976]), the Commission had the authority to direct the Association to redress the wrongs it had committed. The authority to "set requirements that must be complied with" is an important agency tool, available for use in trying to resolve strikes by public employees. Section 9A (*b*) "confers the specific power on the Commission immediately to set requirements to be complied with by the offending party which will eliminate the violation and which may be enforced in case of further violation by resort to the Superior Court." *Id.* at 167. Surely, an order directing the Association, by public announcements and through a meeting of its members, to disavow the strike was appropriate in an attempt to eliminate the violation and to countermand actions that the Commission reasonably could infer the Association had already taken.

2.  We next consider the Association's argument that the judge erred in finding the Association in contempt of the temporary restraining order entered on September 15. The Association does not deny that its officers and negotiating team failed to comply with the temporary restraining order. Rather it argues that the Association cannot be held in contempt on account of the conduct of those individuals. The Association asserts that it did not authorize the conduct of these people because, under its constitution and by-laws, action on behalf of the Association could be taken only by its executive committee. We disagree. The terms of the temporary restraining order put the Association on notice that the judge considered the officers and negotiating team members to be acting on the Association's behalf. In these circumstances, it was incumbent on the executive committee to disavow the conduct of the officers and negotiating team members if the Association was to avoid responsibility for their conduct. Cf. *NLRB* v. *Urban Tel. Corp.*, 499 F.2d 239, 243-244 (7th Cir. 1974); *NLRB* v. *Local 3, Int'l Bhd. of Electrical Workers*, 467 F.2d 1158, 1159 (2d Cir. 1972); *NLRB* v. *Bulletin Co.*, 443 F.2d 863, 867 (3d Cir. 1971), cert. denied sub nom. *Philadelphia Newspaper Printing Pressmen's Local 16* v. *NLRB*, 404 U.S. 1018 (1972).

3.  We come then to the question whether, after finding the Association in contempt of his order, the judge properly resorted to a prospective, coercive fine, payable to the Commonwealth, for each day of any future violation. The Association argues that any fine had to be compensatory and that, because neither the school committee nor the Commonwealth sustained any net loss, the imposition of a fine was not authorized in the circumstances. It argues further that the school committee waived any claim to a fine and that the school committee's waiver bars the imposition of any fine for civil contempt. Finally, the Association argues that the requirement of the payment of a fine to the general fund of the Commonwealth improperly converted what the judge had ruled a civil contempt proceeding into a criminal

contempt proceeding in which the Association should have been granted all the rights of a criminal defendant.

This court has not previously considered whether a conditional, coercive fine may be imposed in a civil contempt proceeding. In previous cases involving the payment of fines for civil contempt, we have considered only compensatory fines. See, e.g., *Manchester* v. *Department of Environmental Quality Eng'r*, 381 Mass. 208, 215 (1980); *Darmetko* v. *Boston Hous. Auth.*, 378 Mass. 758, 762-763 (1979); *School Comm. of New Bedford* v. *Dlouhy*, 360 Mass. 109, 115 (1971). In these opinions, we discussed the adjudications of civil contempt resulting in awards to the injured party and noted that the amount of the award should reflect fair compensation to the injured party.[8] We have upheld, however, the coercive conditional imprisonment of a civil contemnor who had the ability to comply with the court's order. See *Sodones* v. *Sodones*, 366 Mass. 121, 130 (1974). Conditional imprisonment of a contemnor, of course, involves no compensation to the injured litigant. We regard as entirely open in this Commonwealth the question whether conditional fines as a coercive contempt sanction may properly be imposed.[9]

Unlike a criminal contempt which is punitive, to vindicate the authority of the court, a civil contempt order is intended to be remedial and for the benefit of an aggrieved party. *Gompers* v. *Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911). For this reason, both compensatory and coercive orders are considered to be in the nature of civil contempt. See *United States* v. *United Mine Workers*, 330 U.S.

---

[8] In opinions not dealing with coercive fines, this court has either simply not recognized the possibility of a coercive fine in civil contempt (*Godard* v. *Babson-Dow Mfg. Co.*, 319 Mass. 345, 347 [1946]) or has accepted the argument that a punitive fine payable to a public official may not be imposed in civil contempt (*Alves* v. *Braintree*, 341 Mass. 6, 9 [1960]).

[9] In the case before us the coercive fine was announced only after the judge had determined that the Association was in contempt of court. We need not pass on the validity of a conditional, coercive fine as part of an original order of the court.

258, 303-304 (1947). "Remedial or compensatory actions are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience. Coercive sanctions, in contrast, look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order or by assuring that a potentially contumacious party adheres to an injunction by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience" (citations omitted). *Latrobe Steel Co.* v. *United Steelworkers Local 1537*, 545 F.2d 1336, 1344 (3d Cir. 1976). An order imposing a prospective daily fine has a punitive quality when viewed after the fact of its violation because at that point the sanction can no longer be avoided through compliance. Such a punitive effect, however, is not determinative. See *Gompers* v. *Bucks Stove & Range Co.*, *supra* at 443. In distinguishing between civil and criminal contempts, the test is what the court primarily sought to accomplish. *Shillitani* v. *United States*, 384 U.S. 364, 370 (1966). The primary objective of an order imposing a prospective daily fine is to coerce and, as such, it relates to civil contempt. *Id.*

We conclude, therefore, that a fine for a civil contempt of court may properly be imposed where, after an adjudication of contempt of court, the judge has announced that a fine will be imposed for each day of continued contempt of the court's order. Such a fine need not be paid to a complaining litigant, it need not be compensatory, and it may properly be payable to the general fund of the Commonwealth.[10]

[10] In light of this conclusion, we need not consider the Commission's alternative argument that the fine in this case is in fact compensatory. Nor need we consider the question, not discussed by the parties, whether payment of a compensatory fine to the Commonwealth, which is not a party to this action, would be proper. The parties stipulated that the Commonwealth reimbursed the city for approximately two-thirds of the cost of public education in Fall River. They further agreed that the cost of the strike to the school committee was $355,000. Because the teachers were not entitled to compensation for days while on strike nor for additional

In attempting to classify contempt proceedings, courts have viewed the fact that a fine was ordered payable to the government as one indicator that the contempt was criminal in nature. See, e.g., *Nye* v. *United States*, 313 U.S. 33, 43 (1941); *Pabst Brewing Co.* v. *Brewery Workers Local 77*, 555 F.2d 146, 150 (7th Cir. 1977). But, where the principal thrust of the coercive fine is to benefit the employer by providing disincentives for the union to continue its defiance of the court order, the fact that a fine is payable to the government does not change the character of the proceeding from civil to criminal. See *Shillitani* v. *United States*, 384 U.S. 364, 370 (1966); *Latrobe Steel Co.* v. *United Steelworkers Local 1537*, 545 F.2d 1336, 1344 (3d Cir. 1976). In the Federal courts, coercive civil contempt fines are ordinarily payable to the United States. See *Winner Corp.* v. *H.A. Caesar & Co.*, 511 F.2d 1010, 1015 (6th Cir. 1975). It would make little sense for such a fine to be paid to the complainant. *Id.* If the amount of the fine exceeded the reasonable compensation to which the complainant was entitled, the complainant would receive an undeserved windfall. If the amount of a coercive fine were limited to the complainant's loss, the authority of a court to order an effective coercive fine would be unreasonably restricted. Because the fine is coercive, rather than compensatory, the school committee's waiver of any right to be compensated from any contempt fine does not bar the imposition of the fine.

Other courts have approved the imposition of a coercive fine of the character involved in this case. See *United States* v. *United Mine Workers*, 330 U.S. 258, 305 (1947); *NLRB*

days they were required to work to fulfil the provisions of their collective bargaining agreement (see G. L. c. 150E, § 15), the parties agreed that the school committee saved $1,090,000 in unpaid or forfeited salaries during the strike. To achieve the statutory purpose of G. L. c. 150E, § 15, savings in salaries should not be considered in determining the compensable loss to a school committee. If one were to accept the net gain to a school committee's "treasury" from a strike as the proper measure, there would normally be no loss to a school committee as the result of a teachers' strike and thus rarely, if ever, would a compensatory fine be payable.

v. *J.P. Stevens & Co.*, 563 F.2d 8, 25 (2d Cir. 1977), cert. denied, 434 U.S. 1064 (1978); *Oil, Chem. & Atomic Workers Int'l Union* v. *NLRB*, 547 F.2d 575, 597-598 (D.C. Cir. 1976), cert. denied sub nom. *Angle* v. *NLRB*, 431 U.S. 966 (1977); *Latrobe Steel Co.* v. *United Steelworkers Local 1537*, 545 F.2d 1336, 1344-1345 (3d Cir. 1976); *Winner Corp.* v. *H.A. Caesar & Co.*, 511 F.2d 1010, 1015 (6th Cir. 1975); *International Business Machs. Corp.* v. *United States*, 493 F.2d 112, 115 (2d Cir. 1973), cert. denied, 416 U.S. 995 (1974); *Wilmington Fed'n of Teachers* v. *Howell*, 374 A.2d 832, 838 (Del. Sup. Ct. 1977); *Hawaii Pub. Employment Relations Bd.* v. *Hawaii State Teachers' Ass'n*, 55 Haw. 386, 392-393 (1974); *School Dist. of Pittsburgh* v. *Pittsburgh Fed'n of Teachers, Local 400*, 31 Pa. Commw. Ct. 461, 467-468 (1977), rev'd on other grounds, 486 Pa. 365 (1979). We are aware of no case in which the imposition of such a fine has been held to be beyond the authority of a court.

As a matter of policy, a coercive fine payable to the Commonwealth makes sense in the context of a strike by public employees. The anticipated compensable loss to the public employer may not be sufficient to have a coercive effect in such a case. Conditional imprisonment might be undesirable because it would remove the strike leaders from the negotiations at a most critical time and would tend to create an unsatisfactory atmosphere for negotiations. A fine that would have a financial impact on all members of a labor organization may prove a more effective tool in obtaining compliance with the law than the imprisonment of several "martyred" union leaders.

4. We have remaining the question of the reasonableness of the amount of the fine. We conclude that the judge should reconsider the amount. In order to set forth the reasons for our conclusion, we must discuss the origin of the daily fine of $20,000 and the judge's reasons for reflecting it in the final judgment.

At the September 20 hearing held on the Commission's complaint for contempt, the school business administrator

testified that more than $120,000 was deducted annually from the salaries of Fall River teachers and transmitted to the Association. His testimony was confusing as to the cost during the strike of continuing salary obligations to administrators and to cafeteria and janitorial workers, but he concluded that the daily cost of the strike to the city was "something over $20,000 per day." The Commission argued for a prospective fine of $20,000 a day based on the evidence presented, noting that with a prospective fine "we don't have to have the kind of precision of exact damages to the penny that some of the other cases require." The judge's order directed the payment of a fine of $20,000 a day to the clerk of court and did not state what the ultimate disposition of the funds collected would be. At the time the judge selected the daily amount of $20,000 the choice was reasonable in the circumstances, which included the possibility of a compensatory fine. We are not concerned here with the consequences of an announced fine lacking any rational basis for the amount selected and hence having largely a punitive quality.

When, after the strike had been concluded, the case was argued on the merits and on the Association's motion to revoke or reduce the fines, the parties agreed to certain facts. They agreed that the school committee and the Association had entered into a collective bargaining agreement on October 4. In that agreement, the school committee waived any claim to compensation from the Association because of the strike. It was agreed that the city saved $1,090,000 in unpaid teachers' salaries, forfeited pursuant to G. L. c. 150E, § 15, by those teachers who did not report to work during the strike. The total cost of the strike to the school committee was $355,000, reflecting "additional salaries for teachers and administrators who worked extra days, transportation, food, postage, photographic fees, room rentals, security and extra police coverage." During the 1978-1979 school year, the Association anticipated receiving $168,000 in dues, of which $113,400 would be paid to the Massachusetts Teachers Association and $36,750 to the Na-

tional Education Association, leaving about $17,850 for use by the Association. The Association was expected to receive approximately $10,000 in reimbursements and in interest on bank accounts and had received approximately $2,760 to assist it in the payment of fines assessed by the court.

In his memorandum of decision, the judge correctly concluded that the city's saving in teachers' salaries should not be considered in assessing the amount of damages to the school committee and that "it is the $355,000 cost figure that is relevant in the present proceedings." He chided the school committee for abandoning the law suit, leaving the Commission and the court to deal with the consequences of the abandonment. He correctly rejected the Association's argument that no fine could be assessed where the school committee waived the imposition of court imposed contempt fines. He noted that the school committee had no such power, "particularly in a case such as this where the fines were designed to be coercive *as well as compensatory*" (emphasis supplied). He acknowledged that the $20,000 daily fine was based in part on the cost of the strike to the school committee on a daily basis. He did not, however, base his imposition of the fine on its compensatory nature. He regarded the fine as justified because of its coercive objective. He rejected the idea that conditional imprisonment could be the only coercive sanction in a civil contempt action. He further noted the fact that, at the time of its imposition, the fine appeared to have only a punitive quality, but concluded that the crucial date for assessing whether the sanction was punitive or coercive was the date the original order was entered and not the date payment was enforced. We agree with that conclusion.[11]

---

[11] An issue related to a coercive conditional fine is whether a judge may impose a sanction on a contemnor in a civil contempt through the imposition of a determinate prison sentence which is suspended on condition of future compliance with the court's order. In *Jencks* v. *Goforth*, 57 N.M. 627 (1953), the court upheld such a sanction, concluding that it was coercive rather than punitive, even though, following the violation of the court's order, the resulting imprisonment could no longer be avoided through compliance. The *Jencks* decision has been criticized. See Fink,

On the issue of the reasonableness of the fine, the judge concluded that a fine of $20,000 a day was appropriate despite the Association's net disposable annual income of approximately $28,000. He ruled that the Association, as an unincorporated association, could assess its members individually, "provided that only members who participated in or consented to the offending acts are assessed." He concluded that with about 950 members, the Association could raise $237,500 with an assessment of $250 on each member. The judge said that only strike participants should be assessed and that the $80,000 assessed for the two weekends during the strike "should be assessed only against the officers and negotiating team members of the Association, or paid from the Association treasury since the part of the injunction mandating certain conduct on weekends was directed against, and could only be complied with by the officers and negotiating team members." The judge agreed to give the Association a reasonable time to pay the fines.

First, the judge properly noted, citing *United States* v. *United Mine Workers*, 330 U.S. 258, 304 (1947), that the amount of a coercive fine requires consideration of the defendant's financial resources in order to arrive at a fine that will be effective but not unreasonably oppressive. However, he made no finding as to how the figure of $20,000, which, as he noted, had a compensatory aspect when it was first announced, related to the standards set forth in the *United Mine Workers* case for determining coercive fines.[12]

---

Basic Issues in Civil Contempt, 8 N.M.L. Rev. 55, 73-75 (1978); Dobbs, Contempt of Court: A Survey, 56 Cornell L. Rev. 183, 244-245, 276 (1971); Comment, The Coercive Function of Civil Contempt, 33 U. Chi. L. Rev. 120, 130-131 (1965); 39 Minn. L. Rev. 447 (1955); 67 Harv. L. Rev. 889 (1954). We need not, of course, decide the issue in this case.

[12] Compared with fines in other cases, the coercive fine here seems high. *International Business Machs. Corp.* v. *United States*, 493 F.2d 112, 115-117 (2d Cir. 1973), cert. denied, 416 U.S. 995 (1974), involved a coercive fine of $150,000 a day, representing only 5% of the corporation's daily earnings. In *United States* v. *Greyhound Corp.*, 370 F. Supp. 881, 884-885 (N.D. Ill.), aff'd 508 F.2d 529 (7th Cir. 1974), the court imposed a criminal contempt fine in order to achieve a deterrent effect on other

In determining the amount of a fine imposed as a means of securing future compliance, a judge should consider the character and magnitude of the threatened harm, the probable effectiveness of any suggested sanction, the defendant's financial resources, and the seriousness of the burden on that defendant. *United States* v. *United Mine Workers,* 330 U.S. 258, 304 (1947). A coercive fine may not be punitive. *NLRB* v. *J.P. Stevens & Co.,* 563 F.2d 8, 25 (2d Cir. 1977), cert. denied, 434 U.S. 1064 (1978). A judge in finally fixing the amount of a fine should not feel bound in any way by the specific amount originally imposed. *NLRB* v. *Construction & Gen. Laborers' Union Local 1140,* 577 F.2d 16, 21 (8th Cir. 1978), cert. denied, 439 U.S. 1070 (1979). We think that the fine imposed was largely, if not entirely, related to the cost of the strike to the city (computed without consideration of the savings on forfeited teachers' salaries). Certainly, the amount appears unrelated to the ability of the Association to pay such a fine.

We note certain other problems that arise from the judge's conclusions. Although the judge discussed which

corporations which might be tempted to flout a Federal court order. The fine, which the court considered "substantial" was $600,000, a small percentage of the defendants' total earnings of $300,000,000. In *NLRB* v. *J.P. Stevens & Co.,* 563 F.2d 8, 25 (2d Cir. 1977), cert. denied, 434 U.S. 1064 (1978), a case involving violations described as "massive," "cynical," and "flagrantly contemptuous," the court found that fines of $120,000 for each future violation and $5,000 for each day the violation continued, were sufficiently serious to warrant giving the company a second opportunity to show that those figures were unrealistic.

Although comparisons are of limited use, absent figures on financial resources, coercive fines imposed in other States against striking public school teachers appear less severe than those imposed here. See *Wilmington Fed'n of Teachers* v. *Howell,* 374 A.2d 832, 838 (Del. Sup. Ct. 1977) ($5,000 plus $1,000 a day, with maximum amounts set; the sanctions were later increased due to noncompliance, and the ultimate fine reached $30,000); *Hawaii Pub. Employment Relations Bd.* v. *Hawaii State Teachers Ass'n,* 55 Haw. 386, 388, 392-393 (1974) ($100,000 plus $10,000 a day; the total fine reached $190,000 but the court reduced it to $100,000 in the interests of justice); *School Dist. of Pittsburgh* v. *Pittsburgh Fed'n of Teachers, Local 400,* 31 Pa. Commw. Ct. 461, 466, 467-468 (1977), rev'd on other grounds, 486 Pa. 365 (1979) ($25,000 plus $10,000 a day).

persons should bear the burden of portions of the fine, the final judgment made no provision, if it could, for determining precisely who the Association should assess in what amount. The final judgment simply assessed a fine of $260,000 against the Association. None of the members of the Association is a party to this action, not even the Association's officers and members of its negotiating team. It appears to have been a conscious choice of the Commission to proceed only against the Association. In such a situation, injunctions could be issued effectively, at least initially, only against the Association. The contempt complaint was brought solely against the Association. Most importantly, there is no court order involved in the contempt action directly against the strike itself. The only orders that were found to have been violated were orders directing the Association's officers, who were not parties themselves, to disavow the strike and to cease from encouraging it.[13] In these circumstances, we think it is principally punitive, and hence not appropriate, to impose personal liability for a coercive (as opposed to a compensatory) fine on striking members who were not parties to the contempt action and had no reasonable expectation that they would be personally liable for fines assessed against the Association for the failure of its officers to discourage and to disavow the strike. If we were concerned here with the liability of the Association to compensate for the harm done to the school committee, the city, or the Commonwealth, we would take a different view of

---

[13] We note as well that the distinction made in the allocation of the fine among Association members between weekends and school days suggests an attempt to impose personal liability on the Association members for engaging in the strike. There was, however, no significant evidence of the financial resources of the members of the Association, nor was there any evidence of the ability of the officers and negotiating team members to pay the "weekend fines" of $80,000. Moreover, there was no order against the strike for which contempt of court was sought. The contempt fine could not be based therefore, on the act of striking. To be sure, the order enjoined the teachers from engaging in a strike, but the teachers were not parties to the contempt action, and the court order as to the officers of the Association could not itself be the basis for a contempt action against the teachers.

the propriety of directing the Association to assess its members to assist in paying its debts.

### *Conclusion.*

Lest there be any misunderstanding concerning the broad authority of courts to deal with strikes by public employees, we point out the limited nature of the basic issue decided by the court. We have not been concerned in this case with the undoubted authority of courts to impose criminal sanctions for violations of their orders. Nor have we been considering the right of an employer, pursuant to G. L. c. 150E, § 15, to discipline or to discharge an employee who engages in a strike. This case has not directly involved the unquestioned authority of courts in civil contempt proceedings to impose compensatory civil fines against an employee organization, its officers and negotiating team members, and its individual members. Nor has it directly involved the well established authority of the courts to hold individual members and leaders of an employee organization in civil contempt of a court order and to subject them to a prospective coercive fine if they violate the court's order. We have held in this case that a coercive fine properly may be imposed on a labor organization in a civil contempt proceeding, and we have indicated, admittedly in general terms, the standards to be applied in measuring the amount of that fine. We remand the case for a redetermination of the amount of the fine in light of this opinion.[14]

*So ordered.*

---

[14] It is not beyond the authority of the judge to consider anew the question of imposing a compensatory fine in favor of the Commonwealth in this case. There are, however, substantial questions concerning the propriety of such an award that we have noted in this opinion, and there may be other problems.