Botsford, J.
The plaintiffs, two parents and their daughter, assert in this case that the defendant DHT sexually assaulted the plaintiff JME, at the time a four-year-old child, in the course of babysitting for her on a number of occasions between September 1989 and January 1990; DHT at the time was fourteen years old. The plaintiffs bring claims against DHT as well as against his mother and father, the defendants PPT and DRT, respectively. In particular, the plaintiffs allege that the parents are each liable for negligent supervision of their son DHT, and negligent infliction of emotional distress. In addition, the plaintiffs claim that PPT is liable for misrepresentation. PPT and DHT have each moved for summary judgment on all the claims asserted against each.[1] For the reasons discussed below, the motions are allowed.
Background
The summary judgment reveals the following undisputed facts. In July of 1989, the plaintiffs — SME, LSE and their daughter JME — moved into a new home in the same neighborhood where the defendant PPT lived with her children, including the defendant DHT.[2] JME was then three years old, and turned four in September 1989; DHT was thirteen, and turned fourteen in September 1989. Within three or four days of the plaintiffs’ move in July, PPT knocked on the plaintiffs’ door and when SME answered it, introduced herself as a neighbor. In the course of chatting with SME, she told him that her son “was a wonderful baby-sitter and great with kids.” (SME deposition [dep.], pp. 3-4.) Around the same time, PPT met LSE on the sidewalk, and in response to a comment by LSE that she had heard PPT’s son baby sat, PPT said something to the effect of, “[h]e’s a terrific baby-sitter. He loves kids, he’s great, you should use him.” (LSE dep., p. 34.)
After this introduction to DHT, the plaintiffs hired him to baby sit for JME on four occasions — once in September 1989, once in October, once in November, and on December 31, 1989, New Year’s eve. At some point that fall, LSE had a conversation with PPT about a telephone charge to a 900 number that appeared on the plaintiffs’ telephone bill and reflected a date which was one of the nights DRT had baby sat. PPT was upset and said DHT had done something like this at his father’s house.
In early January 1990, following the New Year’s eve baby sitting, JME told her mother that while baby sitting for her, DHT had taken JME’s clothes off, had touched her privates and had made her touch him, and had asked her to lick his penis. It appears this had happened each of the four times DHT baby sat. After LSE learned of the sexual abuse from her daughter, she called PPT to tell her of the conduct. About two days later, PPT called and stated that DHT admitted to acts of sexual abuse LSE had described. PPT asked LSE not to report the matter to the police, and that DHT “[is] working this out in his therapy, or . . . will be working this out in his therapy.” (LSE dep., p. 11.)
DHT had received psychiatric or psychological therapy or counseling beginning when he was five and one-half years old. He saw a psychiatrist for about three months in 1981, another psychiatrist intermittently between December 1982 and October 1984 and then again between January and May 1987; and a psychologist between 1987 and 1988. In October and November of 1989 DHT saw another psychologist for psychological testing and evaluation.[3] DHT’s parents had taken him to see the various therapists in large part because of concerns that DHTwas not performing as well as he should have been in school, was slightly hyperactive or overactive in school, and was acting out somewhat in that venue; PPT was also concerned about DHT’s reaction to his parents’ divorce, his inability to express his feelings. The psychological testing indicated that DHT appeared to be a “solidly average” student in terms of overall achievement, and experienced mild to moderate attentive difficulties as well as some “control problems” that seemed “primarily motivational and emotional in nature.” (Report of Powell Associates [redacted].)[4]
According to their respective affidavits, neither PPT nor DRT had any knowledge of any prior behavior on the part of DHT indicating he had engaged in acts of sexual abuse or misconduct or any emotional or psychological condition that made him unfit to care for a small child.
Discussion
1. Negligent Supervision
“A parent has a duly to exercise reasonable care to prevent his minor child from intentionally or negligently inflicting harm on others, where the parent knows or should know of the child’s propensity for a particular type of harmful conduct and has the opportunity to take reasonable corrective measures.” Alioto v. Marnell, 402 Mass. 36, 38 (1988), citing Caldwell v. Zaher, 344 Mass. 590, 592 (1962). See DePasquale v. Dello Russo, 349 Mass. 655, 657-59 (1965); Norlin v. Connolly, 336 Mass. 553, 554-55 (1957); Watson v. Salvoni, 11 Mass.App.Ct. 735, 738 (1989).
The summary judgment record contains no evidence to indicate or suggest that either PPT or DRT knew or should have known about a prior propensity on the part of their son to engage in inappropriate sexual conduct with others. That DHT had been in therapy off and on for nine years certainly does not signify in itself anything about such a propensity, despite the plaintiffs’ intimations to such an effect.[5] Nor does the fact that the parents knew DHT was a “cut up” in school, prone to overactivity or hyperactiv *417 ity, and lacking some impulse control. There is no evidence presented that these types of behavioral problems are or should be known to be linked to a propensity towards sexual abuse of children (or anyone else), or in some manner presage such a propensity, the plaintiffs’ general assertions to the contrary notwithstanding.
The plaintiffs contend that they are entitled to the benefit of an adverse inference against the defendant parents on the issue of knowledge about their son’s propensities because of their refusal to produce the records of his treatment. The argument fails. There is no dispute that the records of the treatment are privileged, see G.L.c. 233, §20B, c. 112, §§129A, 135A, and that none of the statutory exceptions to the privileges applies in this case. It is also undisputed that DHT turned eighteen in September 1993. Any waiver of privilege would thus need to be made by DHT, not his parents. Even if one were to assume that any “communications” (as defined in G.L.c. 233, §20B) between DRT or PPT and the therapist treating DHT which might be contained in such records would be segregable from the portions of the records reflecting communications between DHT and the therapist, I have ruled in the past that in my view, those “parental” communications would be privileged as well, in light of the fact that at the time of the treatment DHT was a minor, unemancipated child brought to the therapy by his parents. (See memorandum and order on defendants’ motion for protective order, docketed on November 6, 1996 [6 Mass. L. Rptr. 183].)[6]
Putting aside the obvious difficulties which arise where different individuals may assert a privilege with respect to the same records, I conclude that the refusal on the part of PPT and DRT to produce DHT’s treatment records should not be deemed an act which gives rise to an inference against them. The psychotherapist-patient privilege is designed “to protect ‘the justifiable expectations of confidentiality that most individuals seeking psychotherapeutic treatment harbor.’ ’’ Petition of the Dept. of Social Services to Dispense with Consent to Adoption, 399 Mass. 279, 287 (1987) (citations omitted).[7] The defendants’ assertion of the privilege in this case in order to satisfy those expectations of confidentiality cannot be equated to the failure or refusal to call an available witness who might be expected to offer favorable evidence,[8] as the plaintiffs argue, or to the assertion of the privilege of self-in crimination in a civil case.[9] The defendants did not put the psychological status of their son at issue in this case; the plaintiffs did. In contrast to the failure to call an available witness or the refusal to testify on grounds of self-incrimination, where confidential communications to a therapist are involved, there may be excellent reasons for a party’s assertion of the privilege which are wholly independent of whether the communications would or would not be damaging to the party’s position in the case; this seems particularly true where the therapy concerns someone other than the party himself or herself. Accordingly, the drawing of an inference that the records contain information suggesting PPT and DRT were made aware of their son’s propensity for sexual misconduct would not necessarily be reasonable.
Finally, even if an adverse inference were permissible and appropriate, the inference alone would not satisfy the plaintiffs’ burden to produce evidence of actual or constructive knowledge on the defendant parents’ part. Cf. Frizado v. Frizado, 420 Mass. 592, 596 (1995) (privilege against self-incrimination). The plaintiffs have no other evidence to support their claim that PPT and DRT knew or should have known about DHT’s alleged propensity.[10] They are each entitled to summary judgment on the plaintiffs’ claims of negligent supervision.[11]
2. Misrepresentation
The plaintiffs bring their misrepresentation claim only against PPT, and the claim focuses on PPT’s statements to the effect that her son DHT was “a wonderful baby sitter” and “great with kids.”[12] PPT argues that she cannot be liable as a matter of law because clearly the statements were of opinion rather than fact, and in any event, the plaintiffs will not be able to prove that at the time the statement was made, PPT had any reason to believe her son was not a good baby sitter.
The misrepresentation claim of the plaintiffs essentially seeks recovery related to the sexual assaults on JME; the plaintiffs do not contend that the alleged misrepresentation led to pecuniary loss. Compare Restatement (Second) of Torts, §539 (1977). In the circumstances, the precise distinction between fact and opinion may not be so significant. See Restatement (Second) of Torts §§310, 311 (1965). Nevertheless, summary judgment is appropriate because the summary judgment record presents no evidence that PPT knew or should have known that the information she stated concerning her son DHT was false.
Again, the plaintiffs focus on the point that PPT knew that DHT had been in therapy for a good number of years before PPT extolled his baby sitting and child care qualities, and that he was a boy who had some problems with overactivity and impulse control; the plaintiffs state that this knowledge represents “facts incompatible with her solicitation of babysitting business for DHT,” and makes the information she conveyed to the plaintiffs false. Again, I disagree. Long-term therapy — which the record here indicates was sought to deal with DHT’s school performance problems and issues relating to his parents’ divorce— simply cannot be said by itself to disqualify a teenager from baby sitting, or to signify that the teenager will deal poorly with small children. Accordingly, PPT’s knowledge that DHT had been in therapy does not make her challenged statements about DHT false. PPT denies having any other knowledge or information *418 suggesting DHT would not be a good baby sitter, or would not be good with children, and the plaintiffs have not proffered any other admissible evidence to counter PPT’s affidavit and deposition testimony. PPT is entitled to summary judgment on the misrepresentation claim.
ORDER
For the foregoing reasons, it is ordered that: (1) the motion for summary judgment of PPT on Counts One, Two, Seven, Eight, Thirteen and Fourteen of the plaintiffs’ complaint is allowed-, (2) the motion for summary judgment of DRT on Counts One, Seven and Thirteen of the complaint is allowed-, and Counts Three, Six, Nine, Twelve, Fifteen, and Eighteen are dismissed by agreement of the parties.

 The plaintiffs have voluntarily dismissed their claims for negligent infliction of emotional distress against PPT and DRT, and therefore I do not consider those claims. The same is true of the plaintiffs’ claims of misrepresentation against DRT.

At all relevant times, PPT and DRT have been divorced, and shared custody of DHT.

 DHT has also been engaged in individual and group therapy since the alleged events giving rise to this case.

 The plaintiffs have sought on a number of occasions to review the records of DHT’s psychiatric and psychological treatment, as well as the full records relating to his psychological testing and evaluation. (Issues relating to these efforts have been the primary reason for the age of this case.) The plaintiffs’ motions for access have been denied primarily on the basis of privilege. The records and the privileges are discussed below.

 This is the thrust of the plaintiffs’ arguments opposing summary judgment, and is also quite plainly suggested by both plaintiffs in their depositions.

 The same would hold true of “communications” between DHT’s parents and a treating psychologist, as the term is used in G.L.c. 112, §129A, and “communications” between the parents and a social worker, as the term is defined in G.L.c. 112, §135.

 To the extent that the privileges in G.L.c. 112, §§ 129A and 135A come into play, it seems clear that they share the same purpose as the patient-psychotherapist privilege in G.L.c. 233, §20B. See Commonwealth v. Collett, 387 Mass. 424, (1982), for a discussion of the social worker privilege.

See Grady v. Collins Transp. Co., Inc., 341 Mass. 502, 505-06 (1960).

See, e.g., Labor Relations Comm’n v. Fall River Educators’ Ass’n, 382 Mass. 465, 471 (1981). See also Frizado v. Frizado, 420 Mass. 592, 596 (1995), and cases cited Wansong v. Wansong, 395 Mass. 154, 157 (1985).

The plaintiff LSE has submitted an affidavit stating that she was informed by representatives of the Middlesex District Attorney’s Office at some time that DHT had sexually assaulted at least two other children before his assault on JME. This hearsay statement is distinctly not admissible evidence, and cannot be used to satisfy the plaintiffs’ burden in this case. See Madsen v. Erwin, 395 Mass. 715, 721 (1985).

 As mentioned at the outset, the plaintiffs have moved several times for orders granting them access to the treatment records of DHT, but their motions have been denied. After these motions for summary judgment were filed, I caused the various records to be submitted to the court for review in camera, to determine if they contained any non-privileged information bearing on the plaintiffs’ allegation of actual or constructive knowledge on the part of PPT and DRT. I have reviewed all the records of the therapists except for those of Dr. Renee Brant, who began to treat DHT after the events giving rise to this case. I found no unprivileged material in the records I reviewed.

The complaint does not spell out specifically whether the plaintiffs claim the misrepresentations are alleged to have been intentional or negligent. I assume the plaintiffs intend to argue both, although their memorandum opposing summary judgment implies a claim of intentional misrepresentation.