Curtin, J.
This is an action for alleged breach of an insurance contract and G.L.C. 93A unfair and deceptive practices arising from the refusal by defendant Metropolitan Property and Casualty Insurance Co. (“Metropolitan”) to satisfy the plaintiffs automobile damage claim. Metropolitan raised several defenses, which included plaintiff Michael Lentz’s (“Lentz”) failure to cooperate in investigating the loss; his furnishing of false information as to the extent of the alleged damage to, and repair of, the automobile; and his actions in concert with a Metropolitan adjuster and an auto body shop in perpetrating a fraud upon Metropolitan. After a jury verdict for Metropolitan, Lentz filed this Dist/Mun. Cts. RAD. A, Rule 8C, appeal.
This appeal presents an issue of first impression under Massachusetts law as to whether the trial court was correct in instructing the jury that they could draw an adverse inference against Lentz from the invocation of their Fifth Amendment privilege by two non-party witnesses if the jury first found a sufficient relationship between Lentz and the witnesses. We find no error in the courfs jury instruction.
The record discloses the following: The plaintiffs wife, Andrea Lentz (“Mrs. Lentz”), claimed that on September 8,1996, while driving her 1986 Lincoln Town-car limousine on Route 16 in Chelsea, she was hit by an unidentified black Cadillac and pushed into the guardrail. No police or emergency vehicles were called to the scene, and there were no identified witnesses. Mrs. Lentz testified that she did not get out of her car after the alleged accident, hut simply drove her limousine to her home in Tewksbury. She and her husband then examined the limousine and observed that the front was smashed, and that there was damage to the left side and the entire length of the right side of the vehicle. Mrs. Lentz telephoned Metropolitan, their insurer, the next day to report the claimed accident A representative advised her to bring the car to Metropolitan’s drive-in claim center in Woburn on September 13,1996 for an inspection and damage appraisal. Mrs. Lentz also filled out an operator’s accident report which she allegedly sent to Metropolitan, the Registry of Motor Vehicles, and the Chelsea Police. The Chelsea Police have no record of Mrs. Lentz’s claimed accident
On September 9,1996, four days before the scheduled Metropolitan inspection, plaintiff Michael Lentz took the limousine to L&L Collision, an auto body shop operated by his brother, John Lentz, to discuss repairs. Lentz did auto body work *53 for his brother, and there was conflicting evidence as to whether he had, or at one time had, an ownership interest in L&L Collision. Later in the afternoon of the same day, Lentz allegedly took the limousine to the Metropolitan claims center in Woburn. The vehicle was supposedly examined by one Bryan Cook (“Cook”), a Metropolitan appraiser. Lentz had dealings with Cook on two other occasions within the preceding sixteen months.
As in the present case, both situations involved claims by Lentz of extensive property damage to his vehicles caused by unidentified drivers in unwitnessed accidents. On both occasions, Cook acted as the Metropolitan appraiser and issued substantial insurance checks to Lentz.[1]
On September 9, 1996, Cook issued a Metropolitan check to Lentz in the amount of $9,400.53 for damage to the limousine. Lentz had paid $5,500.00 for the vehicle. Although Lentz testified that Cook took photos of the damaged limousine and issued an appraisal, Lentz did not submit any photos or appraisals at trial. Lentz gave the Metropolitan check to his wife, who deposited it to their account on September 11,1996. L&L Collision allegedly did the repair work on the limousine. Mrs. Lentz testified that she paid $9,400.00 in cash for the work and that she handed the money to Paul Donovan, who then passed it to John Lentz. Mrs. Lentz received a receipt from L&L Collision for the cash payment, which was signed by Donovan, an employee of L&L and the shop foreman. Donovan and Lentz have been close friends since high school and see each other socially.
James Bates (“Bates”), Cook’s Metropolitan supervisor, was present at the Woburn claims center on the afternoon of September 9,1996. He never saw Lentz or the damaged limousine at the center. When Bates informed Cook that he would review his paperwork on September 11,1996, Cook claimed that his Metropolitan computer, camera and other equipment had been stolen from his car.
On September 20,1996, Metropolitan supervisor Gary Wrightson (“Wrightson”), an expert in auto body work and insurance appraisal, met with Donovan at L&L Collision to inspect the limousine to determine if Cook’s appraisal was correct and if the work on the vehicle had been properly completed. L&L did not have a copy of the Metropolitan appraisal, nor did it have any documentation of the replacement parts allegedly used in repairing the limousine. Donovan could not produce the damaged parts allegedly removed from the limousine. Wrightson testified that in his opinion, L&L had not performed the work they claim to have completed.
Both Donovan and Cook invoked their Fifth Amendment privilege against self-incrimination at trial. Donovan pleaded the Fifth Amendment when asked if Lentz’s limousine was ever repaired at L&L, and if Lentz had instructed him to prepare fraudulent documentation to deceive Metropolitan into believing that the limousine had been repaired at L&L. Cook invoked his Fifth Amendment privilege in response to questions of whether he had written the Metropolitan claim checks and given them to Lentz, whether he agreed to give them to Lentz in exchange for a bribe, and whether any of the Lentz vehicles were actually damaged.
1. Lentz’s initial argument on this appeal is that the trial judge erred (1) in permitting Cook and Donovan to invoke their Fifth Amendment privilege before the jury, and (2) once they did so, in instructing the jury that they could draw an inference adverse to Lentz if they were persuaded that there was a sufficient relationship between Lentz and said witnesses.
Massachusetts has permitted witnesses in civil actions to claim their Fifth Amendment privilege before the jury. See Shafnacker v. Raymond James & Assoc., Inc., 425 Mass. 724, 735 (1997); Labor Relations Comm’n v. Fall River Educator’s *54 Ass’n, 382 Mass. 465, 471 (1981); Kaye v. Newhall, 356 Mass. 300, 305 (1969). Thus the trial judge did not err in permitting Cook and Donovan to invoke the Fifth Amendment before the jury.
Massachusetts courts have also recognized in civil actions that a reasonable inference adverse to a party may be drawn from the refusal of a party, an employee of a party, or an officer of a corporate party to testify on the grounds of self-incrimination. See Shafnacker v. Raymond James & Assoc., Inc., supra at 735; Department of Revenue v. B.P., 412 Mass. 1015, 1016 (1992); Wansong v. Wansong, 395 Mass. 154, 157, cert. den. 474 U.S. 1014 (1985); Labor Relations Comm’n v. Fall River Educators’ Assn., supra at 471; Kaye v. Newhall, supra at 305. In determining whether an adverse inference should be drawn, courts have taken into consideration the relationship between the witness and the party against whom the inference is to be drawn, whether the subject matter of the testimony is peculiarly within the knowledge and responsibility of the witness, whether the witness has an interest in the outcome of the proceeding, and whether the witness was involved in the disputed transaction or was aware of, or benefitted from, the alleged wrongdoing. See Shafnacker v. Raymond James & Assoc., Inc, supra at 736; Neitlich v. Peterson, 15 Mass. App. Ct. 622, 628 (1983); Data General Corp. v. Grumman Systems Support Corp., 825 F. Supp. 340, 352-353 (D.Mass. 1993), aff’d in part 36 F.3d 1147 (1st Cir. 1994).
Similar factors have been utilized in additional cases in which an adverse inference has been permitted against a party from the invocation of the Fifth Amendment privilege by a non-party witness who was not, at the time of trial, an officer or employee of the party. See Federal Dep. Ins. Corp. v. Fidelity & Deposit Co. of Maryland, 45 F.3d 969, 977-979 (5th Cir. 1995) (adverse inference permitted against a loan officer party from the invocation of a Fifth Amendment privilege by non-party witnesses who were recipients of fraudulent loans if the jury found evidence corroborating the relationship between the party and non-party witnesses); United States v. District Coun. of N.Y. City & Vicinity, 832 F.Supp. 644, 651-652 (S.D.N.Y. 1993) (adverse inferences permitted against defendant in civil conspiracy case where non-party witnesses invoked Fifth Amendment in response to questions which went directly to the acts of corruption charged and there was evidence to tie the witnesses to the alleged fraudulent scheme); Aetna Cas. & Sur. Co. v. Rodco AutoBody, 138 F.R.D. 328, 339 (D.Mass. 1991) (in connection with fraudulent insurance scheme, court permitted negative inference to be drawn against the defendants from the invocation of his Fifth Amendment privilege by a former adjuster for the plaintiff in response to question of whether he was involved with the defendants’ fraudulent claims).
In the case before us, the court gave the following jury instruction regarding the invocation of their Fifth Amendment privilege by witnesses Cook and Donovan:
Also with regard to inferences or possible inferences I permitted two witnesses to be called who claimed their privilege against self-incrimination under the Fifth Amendment to the Constitution of the United States. They, of course, have an absolute right to do that And moreover, in a criminal case, you may not draw any inference against a defendant who claims that privilege. That rule, however, does not apply in civil cases. In a civil case, you may draw an unfavorable inference against a party who claims that his testimony might tend to incriminate.
I emphasize that you are not required to draw an inference from the claim of privilege. Just because somebody takes the Fifth, doesn’t mean you have to think it means something bad about this particular issue. There’s a lot of reasons why people might decide to exercise their privilege against self-incrimination. And moreover, and importantly in this *55 case, the witnesses here who claimed the privilege are not parties to this action. So, there’s a further step that you would have to go to before you could draw any unfavorable inference and that is to determine what their relationship is to the parties and the facts in this action. You should not draw an adverse inference from their claim of privilege in this case against either party here. And remember, the Defendant’s arguing about it against the Plaintiff, but you know one of the witnesses anyway, by all the testimony, used to work for the Defendant Anyway, you don’t draw an adverse inference against either party from the claim of a privilege by those parties. Unless you find that there was a past or present agency or employment relationship between the witness and the party in a matter related to his testimony in this case in such a way that it would be fair to draw an inference unfavorable to the party from the witnesses’ claim of possible self-incrimination. So, you don’t prove the connection, say hypothetically between Mr. Lentz and one of the two witnesses. You don’t prove the connection by the claim of privilege. But if you find the connection based on other evidence, only then could you draw an adverse inference from the claiming of the privilege.
There was no error in this instruction, as ample evidence was presented at trial that Lentz, Cook and Donovan were closely aligned in a scheme to defraud the insurer, Metropolitan. Donovan and Lentz are longstanding friends from high school days, continue to be close and see each other socially. Donovan and Lentz worked together at L&L. Donovan identified himself to Wrightson as L&L’s shop foreman. Lentz admitted he had been an owner of L&L, and currently did some auto body work at the shop for his brother. Lentz received a 1995 W-2 income tax statement in the amount of $70,000.00 from L&L. When Lentz applied for a mortgage loan with GMAC in November, 1996, he listed L&L as his current employer and stated that he had been so employed for over twelve years. Cook and Lentz clearly had business dealings. Cook issued three Metropolitan claims checks to Lentz in a sixteen month period which totaled $21,931.86 for collision damage caused on all three occasions by unidentified vehicles in unwitnessed accidents. In the instant case, Cook gave Lentz a check for $9,400.53 for damage to a 1987 vehicle which had been purchased for $5,500.00 and which Wrightson estimated had an even lower value, even after the alleged repairs. Cook acted without any corroborating documentation, such as repair estimates or photographs of the alleged vehicle damage. When Cook’s supervisor asked to review his records, Cook claimed that his computer had been stolen.
Both Donovan and Cook also had specific knowledge about the transaction in question. As noted, Donovan was the L&L shop foreman at the time the repairs were supposedly made, received the cash payment from Mrs. Lentz, and later met with Wrightson to review the repairs. Similarly, Cook was the claims adjuster who allegedly viewed the damage, and issued the check for the repairs. As listed above, the questions to which each of the witnesses pleaded the Fifth Amendment went to the crux of Metropolitan’s fraud defense. As a practical matter, Metropolitan had few, if any, other options in proving that defense beyond posing such questions to Cook and Donovan.
The judge’s instruction made it clear to the jury that they should draw an inference adverse to Lentz only if they first found a relationship between him and the witnesses. There was substantial evidence at trial which warranted the conclusion that Lentz, Cook and Donovan conspired to defraud the insurer on Lentz’s collision claims. We conclude that the witnesses were so closely aligned with Lentz that an adverse inference could have been properly drawn against him from their invocation of their Fifth Amendment privilege.
*56 2. Lentz also argues that the judge erred by admitting into evidence the two prior property damage claims filed by Lentz and paid by Metropolitan. It was well within the judge’s discretion to admit evidence regarding the previous unwit-nessed accident claims by Lentz and paid by Cook where such evidence was material to the issue of motive, plan or scheme. See Commonwealth v. Otsuki, 411 Mass. 218, 237 (1991); Newton Centre Trust Co. v. Stuart, 208 Mass. 221, 226 (1911). Moreover, the court informed the jury that the evidence of prior claims was admitted not as evidence bearing directly on the issue of whether the accident involved in this case actually occurred, but as evidence which the jury could find demonstrated motive, plan or scheme.
3. Finally, Lentz maintains that it was error for the court to admit into evidence portions of Lentz’s transcribed examination under oath which was taken by Metropolitan prior to trial. Pursuant to the provisions of the auto policy issued by Metropolitan to Lentz, Lentz had a duty to cooperate with the insurer regarding the “investigation, settlement and defense of any claim.” As part of that investigation, Metropolitan conducted an “examination under oath,” which consisted of a sworn question and answer session with Lentz at which he was represented by counsel. Lentz attempted during that examination to distance himself from any involvement with L&L and from any knowledge that Donovan was an L&L employee. At trial, Lentz was more forthcoming regarding his L&L employment, particularly when confronted with the W-2 form and mortgage application described above. The examination under oath was thus admissible both for impeachment purposes and as evidence relevant to Metropolitan’s affirmative defense that Lentz breached the cooperation clause by lying at the examination under oath. See Commonwealth v. Daye, 393 Mass. 55, 65-74 (1984). Therefore, there was no abuse of discretion in the court’s admission of the examination into evidence. See Kobico, Inc. v. Pipe, 44 Mass. App. Ct. 103, 109 (1997).
Appeal dismissed.
So ordered.

 The claims checks were issued by Cook on April 4, 1995, in the amount of $6,109.69, and on January 5,1996, in the amount of $6,421.64.