## Commonwealth *vs.* Kejaun T. Carney & others.[1]

Suffolk. September 13, 2010. - December 8, 2010.

Present: Marshall, C.J., Spina, Cowin, Cordy, Botsford, & Gants, JJ.[2]

*Practice, Criminal,* Discovery. *Rules of Criminal Procedure.*

This court concluded that sanctions imposed pursuant to Mass. R. Crim. P. 14 (c) (1), as appearing in 442 Mass. 1518 (2004), for the violation of discovery obligations are limited to remedial measures aimed at curing prejudice and ensuring a fair trial and, as such, may not include punitive monetary penalties; however, pecuniary awards for the assessment of attorney's fees and other litigation costs incurred in redressing a discovery violation are remedial and fall within the rule as interpreted by this court. [425-429]

A trial court judge's findings regarding the Commonwealth's alleged violations of discovery orders in a criminal matter were clearly erroneous. [429-430]

Discussion of the limited range of circumstances where, in a criminal case, a judge may exercise discretion to hear an ex parte motion for discovery. [430-433]

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on February 27, 2009.

The case was reported by *Cordy,* J.

*Bethany Stevens,* Assistant District Attorney, for the Commonwealth.

*Daniel Beck* for Kejaun T. Carney.

Cordy, J. In this case, we are called on to determine the propriety of a judge's order imposing on the Commonwealth both a $25,000 punitive sanction and attorney's fees for what the judge concluded was a failure to comply with discovery orders issued pursuant to Mass. R. Crim. P. 14, as amended, 444 Mass. 1501 (2005). We conclude that sanctions imposed pursuant to Mass. R. Crim. P. 14 (c) (1), as appearing in 442

---

[1]Kenny D. Farrow; Ronald Watson; and the Cambridge Division of the District Court Department, as a nominal party.

[2]Chief Justice Marshall participated in the deliberation on this case prior to her retirement.

Mass. 1518 (2004), for the violation of discovery obligations are limited to remedial measures aimed at curing prejudice and ensuring a fair trial and, as such, may not include punitive monetary penalties.[3] Pecuniary awards for the assessment of attorney's fees and other litigation costs incurred in redressing a discovery violation are, however, remedial and fall within the rule as we interpret it. See *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 310, 312 (1984). Because we further conclude that the Commonwealth did not violate any of the discovery orders at issue here, we vacate the sanctions order in its entirety.

1. *Background.*[4] This case began as a routine firearm arrest. What followed was two years of litigation over discovery sanctions, including an eleven-day evidentiary hearing, arising principally out of the issuance of an ex parte discovery order.

a. *The arrest.* On September 5, 2008, at approximately 1 A.M., the defendants Kejaun T. Carney, Kenny D. Farrow, and Ronald Watson (defendants) left the Western Front nightclub in Cambridge in a rented automobile. Members of the Boston police department and State police assigned to the youth violence strike force followed the vehicle onto Memorial Drive and directed the driver to pull over for failure to remain within marked lanes. Four officers approached the vehicle and reported an odor of "fresh marijuana." The officers ordered the defendants out of the vehicle and searched the immediate passenger area. During this search, a Boston police detective observed the corner of a plastic bag jutting out from the moulding around the gearshift console. The detective lifted the console and removed the bag, which held a loaded .40 caliber pistol. The defendants were arrested and taken to the State police barracks located at Leverett Circle (Leverett Circle barracks) in Boston. A State trooper drove Carney separately. While removing Carney from the back seat, the trooper found a plastic bag containing four

[3]Rule 14 (c) (1) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), provides: "For failure to comply with any discovery order issued or imposed pursuant to this rule, the court may make a further order for discovery, grant a continuance, or enter such other order as it deems just under the circumstances."

[4]The factual background is drawn from the evidence adduced at the evidentiary hearing on the defendants' motion for sanctions.

smaller baggies of what appeared to be marijuana. All the evidence was secured at the Leverett Circle barracks.

Later that morning, the defendants were arraigned in the Cambridge Division of the District Court Department (District Court) on firearm charges, and Carney was charged additionally with drug offenses.[5] That afternoon, the pistol, its ammunition, and a magazine clip, as well as the plastic bag in which they were found, were taken to the State police crime scene services facility in Sudbury, where they were examined for fingerprint evidence. From there, the items were transported to the State police crime laboratory in Maynard for ballistics testing. On that same day, Trooper Stephen Walsh test-fired the pistol with a bullet from stock ammunition in the State police inventory to ascertain ballistic information requested by the Boston police department.[6] The marijuana remained in an evidence locker at the Leverett Circle barracks.

b. *The ex parte orders.* Four days later, on September 9, Farrow's counsel filed an ex parte motion with the District Court, seeking an order directing the Commonwealth to provide an opportunity for immediate inspection of the "items seized in this matter." In the motion, Farrow's counsel argued that an assertion in the police report that officers could detect an odor of "fresh marijuana" from outside the vehicle was implausible given the small quantity seized and its multiple layers of plastic packaging. Farrow's counsel stressed that, in order to prepare a motion for suppression of the pistol — presumably on grounds that the officers lacked a sufficient basis for the search of the vehicle — and to rebut an anticipated argument from the Commonwealth that the drug's odor had dissipated, counsel for all three defendants pressingly needed to smell the seized marijuana. Farrow's counsel similarly argued that the judge should hear the motion ex parte and impound it thereafter.

---

[5] Eventually, a grand jury returned indictments against all the defendants on firearm charges. The Commonwealth contends that the events surrounding the discovery litigation in the case precluded it from analyzing the marijuana evidence, and consequently it declined to bring any drug charges against Carney. A judge in the Superior Court dismissed all criminal charges against Farrow and Watson. The judge denied Carney's motion to dismiss.

[6] As a policy, Boston police seek ballistic reports to investigate whether seized guns are linked to other shootings in the city. The defendants lived in Boston.

The judge met with the attorneys for all three defendants, ex parte, in his lobby. When the judge and the attorneys returned to open court, the judge informed the assistant district attorney that he had allowed a discovery motion ex parte. After noting an objection from the Commonwealth, the judge then indorsed the order (initial order). Although the ex parte motion was directed at obtaining access to the marijuana, the initial order required that defense counsel be given access to "all evidence seized in this matter" for inspection "immediately and in any event prior to the transport of said evidence to any lab for testing."[7]

At approximately 12:45 P.M., the case was recalled, at which time Farrow's counsel reported to the judge that she had spoken over the telephone with Trooper Thomas Briody at the Leverett Circle barracks, who told her that he would not open the evidence bag containing the marijuana in compliance with the court order.[8] She also informed the judge that the firearm evidence was at the crime laboratory and that the marijuana was to be sent to the laboratory the following day. The assistant district attorney stated that it was unclear what had been ordered and requested clarification in light of the Commonwealth's exclusion from the ex parte hearing.

At 2 P.M., in an open court hearing before the judge, defense counsel jointly submitted a proposed second order, requiring the Commonwealth to present all evidence for inspection by 10 A.M. the next day, September 10, in District Court, regardless of its present locus. The assistant district attorney objected, citing concerns over the possible contamination of evidence, and informed the judge of the Commonwealth's intent to petition for extraordinary relief from a single justice of the Supreme Judicial Court, pursuant to G. L. c. 211, § 3. The judge in-

---

[7]The initial order was entered in Farrow's case and read:

"The Commonwealth and law enforcement associated with the above-captioned matter are hereby ordered to make all evidence seized in this matter available for inspection to defense counsel and her designees . . . immediately and in any event prior to the transport of said evidence to any lab for testing."

[8]Trooper Briody had not been served with a copy of the initial order and was not otherwise aware of it before the telephone call.

dorsed the defense counsels' proposed order (10 A.M. order),[9] a copy of which was then sent by facsimile transmissions to Trooper Briody in Boston and Trooper Walsh in Maynard. The order made no mention of testing. On September 10, at 8:30 A.M., the Commonwealth filed its petition for extraordinary relief with the single justice. At about that same time Trooper Walsh, having learned of the 10 A.M. order, voiced concerns to a superior officer that compliance with the order might cause contamination of the firearm evidence. At approximately 9 A.M., after a series of conversations, Major James M. Connolly, head of the State police forensics services group, authorized an expedited deoxyribonucleic acid (DNA) swab test of the pistol. The pistol was delivered to a technician, and logged into her custody, at 9:43 A.M. It was then swabbed for DNA residue. Meanwhile, at 9:41 A.M., Kristen L. Sullivan, the State police DNA unit supervisor, sent an affidavit (Sullivan affidavit) by facsimile transmission to the assistant district attorney for use in the single justice proceeding that addressed the Commonwealth's contamination concerns in technical detail.[10]

At 9:50 A.M., the single justice orally stayed the judge's 10 A.M.

---

[9]The proposed order (10 A.M. order) was entered in Farrow's and Watson's cases and read:

> "The Commonwealth and law enforcement associated with the above-captioned matters (including but not limited to the State Police) are hereby ordered to make all evidence seized in the investigation of this matter available for a meaningful opportunity to inspect by defense counsel and counsels' designees . . . immediately, regardless of whether the evidence has left the state police barracks facility and has been transported to another state lab or state police facility (including but not limited to the state's Maynard ballistics unit, the State Lab in Sudbury, or the drug storage unit in Foxborough).

> "In particular, it is ordered that the State Police bring on September 10, 2008, by 10:00 A.M. to this Court (at Courtroom 13A [Motions Session]) all evidence seized in the investigation of this matter (including all alleged drugs and all alleged firearms evidence), so that defense counsel may have a meaningful opportunity to inspect said evidence.

> "A 'meaningful opportunity to inspect' means that on request by the defense the evidence must be taken out of whatever State Police packaging it has been placed into since its seizure. So ordered."

[10]In her affidavit, Sullivan averred: "It is my understanding that the [pistol and ammunition] have yet to undergo processing by the Massachusetts State

order that all the evidence be produced that morning at District Court, and provided notice to the parties that he would issue a written order in the afternoon. The assistant district attorney then left a telephone message for Trooper Walsh informing him that the pistol (and related ballistics evidence) was no longer required in court that morning. With respect to the marijuana evidence, Trooper Briody arrived in District Court before 10 A.M. with the evidence sealed.

In Maynard, at 10:41 A.M., the pistol was returned to Trooper Walsh after its DNA swabbing. Around 11:30 A.M., after releasing Trooper Briody from court and instructing him not to perform any testing on the marijuana, the assistant district attorney again telephoned Trooper Walsh, leaving a message for him not to conduct any further testing on the pistol. Trooper Walsh, however, did not get this message until after he had returned from lunch and test-fired the pistol, this time with one of the bullets seized during the arrest. Trooper Walsh estimated that he finished his test-firing at approximately 1:30 P.M.

At 1:50 P.M., the single justice issued a written order that, inter alia, stayed the 10 A.M. order, instructed the Commonwealth to maintain "the status quo of the evidence," and directed all counsel to submit proposed written findings to the judge on the initial order. In light of the fact that the District Court judge had no opportunity to review and consider the Sullivan affidavit, the single justice also remanded the matter for a rehearing.

After the rehearing on September 11, the District Court judge issued an amended order that mandated inspection of specifically enumerated evidence, including the pistol, bullets, mari-

---

Police Crime Laboratory's Criminalistics and DNA Unit." Sullivan testified at the hearing on the motion for sanctions that she was unaware that as she was drafting her affidavit, analysts were swabbing the pistol for DNA residue. The defendants argue that by filing this affidavit with the single justice at 10:09 A.M., without revealing to any tribunal that testing on the pistol had, in fact, commenced, the Commonwealth violated the 10 A.M. order and "perpetrated a fraud upon the court." In his order for sanctions, the judge stressed that the "affidavit of Kristen Sullivan, although inaccurate at the time of filing with the [Supreme Judicial Court], was of no consequence to any subsequent court decision or order and not relied upon by the Commonwealth in the District Court." Because the Sullivan affidavit formed no basis for the judge's imposition of sanctions, it is not relevant to our review, and we decline to address the defendants' claim of fraud.

juana, and plastic bags, but that allowed the Commonwealth to designate the location of inspection, and required defense counsel or its agents to use "latex gloves, surgical masks, and other protective gear supplied by the Commonwealth."

After learning that the pistol had already been swabbed for DNA residue and test-fired in Maynard, the Commonwealth submitted a supplemental filing to the county court, dropping its objection to defense counsel's inspection of the pistol but renewing its objection with regard to the marijuana and plastic bags, citing "environmental contamination." The filing states incorrectly that "all testing of evidence was suspended in light of [the judge's] orders of September 9, 2008." On September 18, the single justice denied the Commonwealth's petition for extraordinary relief and vacated his prior stay, reasoning that the precautions imposed by the judge's amended order were an adequate safeguard against contamination.

c. *The sanctions.* On September 22, the judge ordered the Commonwealth to arrange inspection by 1 P.M. that day, and the defense team inspected the evidence in Boston and Maynard. That same day, counsel for the defendants jointly filed a motion for sanctions against the Commonwealth pursuant to rule 14 (c) (1), arguing, inter alia, that the Commonwealth "willfully and improperly obstructed the execution" of the judge's discovery orders by performing tests on the pistol on September 10, and made "material false representations and arguments" to the District Court judge and the single justice. Commencing on October 22, the judge presided over an evidentiary hearing on the motion for sanctions that spanned three weeks. Although not the object of the defendants' ex parte discovery motion, the handling of the ballistics evidence was the principal focus of the hearing and the resulting sanctions order. The defendants called seventeen witnesses, and the judge ordered testimony from two assistant district attorneys and declared them hostile witnesses. The Commonwealth did not present evidence.

On December 23, the judge issued an order (sanctions order) sanctioning the Commonwealth $25,000 in punitive fines, plus the fees and expenses incurred by each defense attorney in litigating the motions for discovery and sanctions. The judge found that the Commonwealth "did not maintain the status quo

as ordered and intentionally disregarded orders of this Court and the single justice of the Supreme Judicial Court" by (1) swabbing the pistol for DNA residue on September 10; (2) test-firing the pistol on September 10; and (3) failing to produce the pistol and marijuana at District Court as required by the 10 A.M. order. The judge wrote that the Commonwealth's actions were "sufficiently egregious" to justify sanctions that "should communicate to the Commonwealth, the state police and all police departments that a wilful and intentional violation of a valid court order will not be permitted, nor tolerated by this Court." The judge cited rule 14 (c) (1) as the authority for imposition of the sanction.

On February 27, 2009, the Commonwealth sought relief from the sanctions order pursuant to G. L. c. 211, § 3. A single justice ordered a stay of the order, and reserved and reported the case to the full court.[11]

2. *Discussion.* We review the judge's sanctions order for abuse of discretion or other error of law. On review of the record, we follow the well-established principle that subsidiary findings of fact made by the judge below will be accepted by the court absent clear error. See *Commonwealth* v. *Aarhus*, 387 Mass. 735, 742 (1982). We begin with a discussion of the boundaries of rule 14 (c) (1), then examine the findings that the Commonwealth contravened discovery orders and underscore the limited range of circumstances in which ex parte discovery orders are permissible.

a. *Rule 14 (c) (1) and punitive sanctions.* Rule 14 (a) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), governs procedures for pretrial discovery in criminal actions. The rule establishes automatic mandatory discovery for the defendant and reciprocal discovery for the Commonwealth. The rule's requirements for such discovery have the force and effect of a court order. Mass. R. Crim. P. 14 (a) (1) (C). In addition, the rules give judges the discretion to alter or amend discovery orders as the interests of justice require, and to order additional discovery not otherwise required

---

[11]A judge in the Superior Court (where the cases were then pending following the defendants' indictments) granted a request to stay the prosecution of Carney, the only remaining defendant. See note 5, *supra.*

to be provided automatically. Mass. R. Crim. P. 14 (a) (7). Rule 14 (c) (1) is one of the rule's enforcement provisions. See note 3, *supra.*[12]

We have not previously been called on to determine whether rule 14 (c) (1) permits the imposition of punitive monetary sanctions.[13] The defendants argue that our acknowledgment of "the broad range of sanctions available to trial judges for noncompliance with required discovery" in concert with the catch-all provision in rule 14 (c) (1) empowering a court to "enter such other order as it deems just" militates in favor of punitive fines. *Commonwealth* v. *Baldwin*, 385 Mass. 165, 177 (1982). Mass. R. Crim. P. 14 (c) (1). We hold that it does not.

Although the validity of punitive fines for rule 14 discovery violations is a matter of first impression, we have discussed the prevailing purpose of judicial sanctions for discovery violations in a variety of contexts. See, e.g., *Commonwealth* v. *Felder*, 455 Mass. 359, 367 (2009) (additional sanctions against Commonwealth under rule 14 [c] [1], in the form of jury instruction, for alleged untimely disclosure of photographs not appropriate where Commonwealth was not permitted to admit photographs and any potential prejudice to defendant thereby mitigated); *Commonwealth* v. *Gonzalez*, 437 Mass. 276, 279-280 (2002), cert. denied, 538 U.S. 962 (2003) (reversing trial judge's order under rule 14 [c] excluding Commonwealth's evidence of school zone measurements and drug analysis as sanction for delayed disclosure, where no showing of prejudice and less severe and more appropriate remedy of continuance available); *Commonwealth* v. *Reynolds*, 429 Mass. 388, 399-400 (1999) (judge's preclusion of defendant's evidence under rule 14 [c] [2] was error where Commonwealth was not significantly prejudiced by late disclosure and there were reasonable alternative means of

---

[12]Rule 14 (c) (2) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), also provides explicitly for the remedy of exclusion, stating, inter alia: "The court may in its discretion exclude evidence for noncompliance with a discovery order issued or imposed pursuant to this rule."

[13]Neither rule 14 (c) (1) nor the Reporters' Notes offers guidance on the issue. Neither provides affirmative or negative instruction on the availability of monetary sanctions, punitive or otherwise. See Reporters' Notes to Rule 14 (c) (1), Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1505 (LexisNexis 2010).

achieving purpose of rule); *Commonwealth* v. *Hamilton*, 426 Mass. 67, 69-70 (1997) (upholding denial of motion to exclude evidence and two-week continuance [sought under rule 14] when Commonwealth disclosed fingerprint analysis on the day of trial where judge granted two-day continuance and there was no showing of prejudice); *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 749 (1986) (motions to suppress should have been allowed; new trials ordered where material evidence that should have been made available to defendants during discovery intentionally destroyed by Commonwealth during testing, resulting in prejudice to defendants).

What emerges from these and other cases are two principles that we conclude govern the sanctions provisions of rule 14. First, sanctions are remedial in nature. Second, sanctions should be tailored appropriately to cure any prejudice resulting from a party's noncompliance and to ensure a fair trial. These principles are similar to those that we have applied in other contexts where police or prosecutorial misconduct has been established. See, e.g., *Commonwealth* v. *Mason*, 453 Mass. 873, 877 (2009) (even in face of egregious police misconduct, "we have never dismissed charges in such circumstances in the absence of prejudice"); *Commonwealth* v. *Hernandez*, 421 Mass. 272, 277-278 (1995), quoting *Commonwealth* v. *Cronk*, 396 Mass. 194, 201 (1985) (whether sanction of dismissal appropriate requires assessment whether prosecutor's refusal to disclose information during discovery "caused such irreparable prejudice that the defendant could not receive a fair trial if the complaint were reinstated"); *Commonwealth* v. *Hine*, 393 Mass. 564, 570, 573 (1984) (motion to dismiss for police forgery of Miranda waiver properly denied because "[o]ur emphasis has always been that any remedy should be tailored to cure the prejudice to the defendant").

Remedial sanctions may not always be adequate to ensure the "absolute necessity for integrity in law enforcement"; nevertheless, judicial responses in the individual cases "should be limited to truly remedial, and not punitive measures." *Commonwealth* v. *Mason*, *supra* at 878, quoting *Commonwealth* v. *Hine*, *supra* at 573. See *Commonwealth* v. *Hernandez*, *supra* at 277-279; *Commonwealth* v. *King*, 400 Mass. 283, 290-292 (1987). There are, of course, other available avenues, not at issue here, to

sanction contumacious conduct in judicial proceedings and to punish police misconduct.

Consistent with our jurisprudence, and as "final arbiter of what the rule means and permits," *Commonwealth* v. *Durham*, 446 Mass. 212, 221, cert. denied, 549 U.S. 855 (2006), we conclude that rule 14 (c) (1) is properly read to permit a judge to enter a broad range of orders in response to a failure to comply with discovery orders, but that a judge is nonetheless limited to orders that are remedial in nature, aimed at curing any prejudice caused by the violation of a discovery obligation and ensuring a fair trial. We decline to interpret rule 14 (c) (1) to authorize monetary penalties imposed for punitive rather than remedial purposes.[14]

In this case, the judge imposed a punitive monetary sanction. The judge specifically found that the violations of the discovery orders he concluded the Commonwealth had committed "were not sufficiently egregious or prejudicial to warrant dismissal or suppression of the evidence," and therefore imposed $25,000 in monetary sanctions, in addition to fees and costs incurred by each defense attorney. Illustrating his punitive focus, the judge wrote, "Such a sanction should communicate to the Commonwealth, the state police and all police departments that a wilful and intentional violation of a valid court order will not be permitted, nor tolerated by this Court."

---

[14]We need not decide in this case whether monetary sanctions ordered to coerce compliance with disregarded discovery obligations are within the array of remedial orders permissibly entered under rule 14 (c) (1). As a general matter, a judge may find a party to be in civil contempt by reason of the party's failure to comply with a court order, and the judge may impose a daily fine on the party to coerce compliance with the order. See *Commonwealth* v. *Rape Crisis Servs. of Greater Lowell, Inc.*, 416 Mass. 190, 192-193 (1993). "Unlike a criminal contempt which is punitive, to vindicate the authority of the court, a civil contempt order is intended to be remedial and for the benefit of an aggrieved party." *Labor Relations Comm'n* v. *Fall River Educators' Ass'n*, 382 Mass. 465, 475 (1981). See *Mahoney* v. *Commonwealth*, 415 Mass. 278, 284-285 (1993) (sanction remedial where party can "purge himself" by performing affirmative act required by court order). See also *L.F.* v. *L.J.*, 71 Mass. App. Ct. 813, 823 (2008). Coercive sanctions "look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order . . . by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience." *Labor Relations Comm'n* v. *Fall River Educators' Ass'n, supra* at 476, quoting *Latrobe Steel Co.* v. *United Steelworkers Local 1537*, 545 F.2d 1336, 1344 (3d Cir. 1976).

The defendants assert forcefully that trial judges must be afforded wide discretion to determine the severity of a sanction, relying on *Commonwealth* v. *Giontzis*, 47 Mass. App. Ct. 450, 459 (1999) ("Sanctions for non-compliance with discovery are within the judge's discretion"). We agree that judges possess wide discretion and that more severe discovery violations may warrant more severe remedial sanctions, but that does not change our view that the purpose of such sanctions must be remedial, not punitive.[15]

b. *The Commonwealth's alleged discovery violations.* We next analyze the propriety of the judge's pecuniary sanction for "the expenses of each defense attorney in litigating their motions for discovery and sanctions." While the sanction is remedial in nature, the propriety of its imposition depends on the correctness of the judge's findings of violations. Specifically, the judge found that the Commonwealth did not maintain the status quo of the evidence and intentionally disregarded court orders in three separate instances. We examine each in turn.

The judge first found that the Commonwealth violated his discovery orders when it "conducted DNA swabbing of firearm evidence on September 10, 2008." The evidence established that the pistol was swabbed for DNA residue shortly after it was logged in with a DNA technician at 9:43 A.M. on September 10, 2008. At this time, the judge's initial order and the 10 A.M. order may still have been in effect (although they were stayed minutes later). However, no language in either order directed the Commonwealth to halt the testing of evidence already in the laboratory for that purpose. There was no violation.

---

[15]The defendants argue that Mass. R. Crim. P. 48, 378 Mass. 923 (1979), is an additional source of authority for the imposition of the $25,000 monetary sanction against the Commonwealth. The judge levied a fine against the "Commonwealth" for three purported violations by the "Commonwealth, i.e., the state police." We decline to address the validity of the judge's fine under Mass. R. Crim. P. 48 because that rule is applicable only to violations by individual attorneys. Mass. R. Crim. P. 48 (authorizing sanction for "wilful violation by counsel," including "fine"). See *Commonwealth* v. *Steinmeyer*, 43 Mass. App. Ct. 185, 190 (1997). Rule 48, "recognizing the usually dominant role of attorneys rather than clients in procedural rule violations, permits the court to impose appropriate sanctions upon counsel." *Id.* In this case, the judge criticized the conduct of the State police and by imputation the Commonwealth, not any individual assistant district attorney. Rule 48 is inapposite.

The judge found the second violation when the Commonwealth "test-fired the firearm on September 10, 2008." The evidence was that Trooper Walsh test-fired the pistol with a round of seized ammunition after his normal lunch hour, at about 1:30 P.M., on September 10, 2008. At that point in time, the single justice's 9:50 A.M. oral stay of both the judge's initial order and his 10 A.M. order was in effect. The single justice's written order, which ordered the Commonwealth to maintain the status quo of all evidence, did not issue until 1:50 P.M. that same day. Because the single justice had not yet entered his written order, and the judge's less-than-explicit prior orders had been stayed, no violation occurred by test-firing the pistol at 1:30 P.M.

The judge found the third violation when the Commonwealth "failed to produce the firearm and marijuana to this Court by 10 A.M. on September 10, 2008 for inspection." The evidence was that Trooper Briody arrived, in uniform, at District Court with the marijuana before 10 A.M. While it is correct that the Commonwealth did not produce the pistol, bullets, magazine clip, or plastic bags in court, the judge's 10 A.M. order was no longer operative after the single justice's oral stay at 9:50 A.M. The defendants argue that by administering tests on the pistol a mere fifteen minutes before the pistol was due in court, the Commonwealth evinced its true intent to obstruct court orders. While it strains the imagination to suppose that the evidence could have been rushed from the laboratory in Maynard to Cambridge in just fifteen minutes, it is not our role to engage in conjecture. The fact is that the judge's 10 A.M. order that the pistol be produced had been stayed, obviating any violation that might otherwise have occurred in the absence of the stay.

c. *Ex parte procedures.* The record reflects an aura of confusion surrounding these discovery orders, leading to the subsequent sanctions proceedings. This confusion is a result, in part, of the judge's improvident decision to hold the motion hearing ex parte.

We have declined to follow the practice of some jurisdictions in imposing a blanket proscription on ex parte motions for discovery, see *Commonwealth* v. *Mitchell,* 444 Mass. 786, 793-794 (2005) (*Mitchell*). But after the matter was heard in the District Court, we carefully delineated a limited range of circumstances where a judge may exercise discretion to hear such

a motion. See *Commonwealth* v. *Shaughessy*, 455 Mass. 346, 356 (2009), and cases cited. The defendants' motion to inspect the marijuana seized in this case fell outside those narrowly drawn bounds. See *id.*; *Mitchell, supra.*

A motion may be made ex parte only in "exceptional circumstances." *Mitchell, supra* at 793. In the *Mitchell* case, we held that a defendant could make a motion ex parte to compel pretrial production of documents only (1) if the basis of the motion would reveal incriminating information, which the prosecution would otherwise not be entitled to receive; or (2) when advance notice of a request for a summons would likely result in the destruction or alteration of the documents themselves.[16] *Id.* at 793-794, 797. In other cases, "input from the Commonwealth will be of real value to the judge." *Id.* at 792, citing *Commonwealth* v. *Lam*, 444 Mass. 224, 229 (2005). In further limiting this small universe of "exceptional circumstances," we wrote that an "ex parte motion for pretrial production of documents cannot be made on the basis that notice to the Commonwealth will reveal trial strategy or work product or might disclose client confidences." *Mitchell, supra* at 797. To hold otherwise would create "a loophole that could not be contained." *Id.*

Additionally, albeit in the context of Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979), rather than rule 14, we concluded, in the *Mitchell* case, that the judge should seal or impound only as much of the defendant's motion and affidavit as is absolutely necessary to protect the defendant's interests, and then allow the Commonwealth to be heard on the defendant's request for ex parte consideration. *Id.* Where the Commonwealth's presence would vitiate the purpose of the motion entirely, the judge should have a stenographic record made of all ex parte proceedings. *Mitchell, supra* at 797-798.[17]

---

[16]*Commonwealth* v. *Mitchell*, 444 Mass. 786 (2005), dealt with the validity of an ex parte motion for issuance of summonses directing pretrial production of documents pursuant to Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979). "A judge hearing a rule 17 (a) (2) motion must evaluate whether the requirements [announced in *Commonwealth* v. *Lampron*, 441 Mass. 265 (2004)] of relevance, admissibility, necessity, and specificity have been met, or whether the defendant's motion constitutes a disguised attempt to undermine rule 14 by launching an improper 'fishing expedition.' " *Commonwealth* v. *Mitchell, supra* at 792.

[17]The judge did not have the benefit of *Commonwealth* v. *Shaughessy*, 455

Here, there was no basis for the judge to hear, let alone grant, a motion in an ex parte proceeding. The argument was that a defendant should "not ever be put in a position of having to reveal or explain to the prosecution the nature of his intended investigation and defense positions." However, as we underscored in *Mitchell, supra* at 797, this argument is without merit ("trial strategy" and "work product" are not cognizable grounds for ex parte submission). Granting an ex parte motion for such a universally applicable reason would transform ex parte procedures into the "norm and not the exception." *Id.* The record here is bereft of any evidence of the danger of incrimination or any other justifiable reason why advance notice to the Commonwealth would imperil the evidence or risk its alteration. *Id.* at 793-794, 797. Indeed, there was no affidavit filed with the motion for ex parte treatment of the discovery request. The admitted distrust of police and unsubstantiated fear of evidence tampering cannot form the reason for an ex parte submission.[18]

This case is illustrative of the inherent risk of confusion that stems from ex parte discovery orders. The judge's initial order required inspection of "all evidence" by defense counsel "prior to the transport of said evidence to any lab for testing." However, not only had the pistol, and all other ballistic evidence, already been transported to State police crime laboratories, but the pistol had already been fingerprint tested and test-fired. Had the Commonwealth been given an opportunity to be heard on the motion, it could have corrected this misapprehension and forestalled later confusion. Moreover, the language of the initial order did not prohibit further evidence testing, but prohibited the "transport" of the evidence for testing.[19] If the Com-

Mass. 346, 357-358 (2009), where we cast more light on the topic, in a different circumstance, by holding that before relying on a defendant's ex parte motion to defeat the Commonwealth's privilege against disclosure of the identity of a confidential informant, a redacted or summary of the submission must be provided, so the Commonwealth effectively might be heard in response. See *Commonwealth* v. *Madigan*, 449 Mass. 702, 706 (2007), quoting *Commonwealth* v. *Douzanis*, 384 Mass. 434, 441 (1981) (discussing "substantial, worthwhile purpose" of Commonwealth's informant privilege).

[18]The judge did not deploy any of the procedural safeguards we endorsed in *Mitchell, supra* at 797-798. No stenographic record exists of the ex parte lobby conference where the judge heard argument on the motion.

[19]As noted, the judge's 10 A.M. order also does not contain any express language barring testing of the evidence.

monwealth had had an adequate opportunity to be heard, the judge could have been asked for and given much needed clarification, and the Commonwealth, correspondingly, could have issued clear instructions to the State police. Instead, the Commonwealth was required to interpret the meaning of a somewhat cryptic order drafted by defense counsel, which was inconsistent with the existing facts (the ballistics evidence had already been transported and tested), where the particulars of the motion and the judge's reasoning in granting the order were effectively embargoed.

3. *Conclusion.* The findings of the judge as to all three violations of the discovery orders were clearly erroneous, and the imposition of the $25,000 punitive fine was an error of law. Therefore, the case is remanded to the county court for the entry of a judgment vacating the sanctions order against the Commonwealth in its entirety.[20]

*So ordered.*

---

[20]We in no way indorse the Commonwealth's argument that it may not be sanctioned for disobeying an unlawfully issued court order. This argument is unavailing. Litigants may not resort to self-help remedies and unilaterally flout court decrees. See *Stow* v. *Marinelli*, 352 Mass. 738, 744 (1967). "Even if erroneous, a court order must be obeyed, and until it is reversed by orderly review, it is to be respected." *Mohamad* v. *Kavlakian*, 69 Mass. App. Ct. 261, 264 (2007), citing *United States* v. *United Mine Workers*, 330 U.S. 258, 294 (1947). Equally unavailing is the Commonwealth's argument that the "principle of sovereign immunity protects the public treasury" from the issuance of monetary sanctions against it. As we have discussed in this opinion, rule 14 does not authorize the imposition of punitive fines as a sanction against the Commonwealth, but in the past and in another context, we have upheld both an assessment of attorney's fees and a coercive civil penalty against the Commonwealth. *Commonwealth* v. *One 1987 Ford Econoline Van*, 413 Mass. 407, 414 (1992).