SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. RICHARD DILWORTH

 
 Docket:
 SJC-13547
 
 
 Dates:
 May 6, 2024 - September 6, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Social Media. Electronic Surveillance. Constitutional Law, Equal protection of laws. Selective Prosecution. Evidence, Selective prosecution, Disclosure of evidence, Profile, Statistics. Practice, Criminal, Disclosure of identity of informer, Disclosure of identity of surveillance location, Dismissal. Firearms.
 
 

             Indictments found and returned in the Superior Court Department on June 12 and 14, 2018.
            A pretrial motion for discovery was heard by Peter B. Krupp, J., and a motion to dismiss was heard by Robert L. Ullmann, J.
            The Supreme Judicial Court granted an application for direct appellate review.
            Caitlin Fitzgerald, Assistant District Attorney (Elisabeth Martino, Assistant District Attorney, also present) for the Commonwealth.
            Joshua Raisler Cohn, Committee for Public Counsel Services (Matthew Spurlock, Committee for Public Counsel Services, also present) for the defendant.
            Maithreyi Nandagopalan, of New Mexico, Isabel Burlingame, Jessica J. Lewis, & Mason A. Kortz, for Michael G. Bennett & others, amici curiae, submitted a brief.
            Luke Ryan, Molly R. Strehorn, Melissa Celli, Joshua M. Daniels, & Katharine Naples-Mitchell, for Massachusetts Association of Criminal Defense Lawyers & another, amici curiae, submitted a brief.
            GAZIANO, J.  We address in this appeal whether a Superior Court judge abused his discretion in dismissing with prejudice indictments charging unlawful possession of a firearm and related offenses to sanction the Commonwealth for its refusal to comply with a discovery order.  The discovery dispute arises from the defendant's three-year effort to obtain information relating to the Boston police department's undercover monitoring of social media accounts on Snapchat belonging to suspected gang members.  Discovery was relevant and material, the defendant contended, to challenge a discriminatory investigatory practice on equal protection grounds.  At issue is a discovery order, dated June 24, 2021, that required the Commonwealth to disclose "the user icons or bitmojis, and other user names" used by police to infiltrate and monitor Snapchat social media accounts.  A judge determined that this information would "persuasively and visually" demonstrate the racial compositions of individuals targeted for Snapchat monitoring.  
            Relying on the governmental interests protected by the surveillance location and confidential informant privileges, the Commonwealth and Boston police department (BPD) refused to comply with the order.  The Commonwealth argued also that social media surveillance was not a type of police investigatory practice subject to equal protection scrutiny under Commonwealth v. Long, 485 Mass. 711, 724-725 (2020), and Commonwealth v. Lora, 451 Mass. 425, 436-438 (2008).  A judge granted the defendant's motion to dismiss with prejudice, finding that the defendant was prejudiced by the government's deliberate refusal to produce court-ordered discovery.  The Commonwealth appealed, and we granted its application for direct appellate review.  Discerning no abuse of discretion, we affirm.[1]  
            1.  Background.  In October 2017, a BPD officer assigned to the youth violence strike force (YVSF or gang unit) submitted a "friend" request through the Snapchat social media application to follow an account with the username "youngrick44."[2]  The officer did not identify himself as a police officer, and he did not use either the name or photograph of anyone known to the defendant.  The defendant, as "youngrick44," accepted the request and unknowingly became "friends" with the gang unit.  In view of his Snapchat friends, the defendant posted seven video recordings (videos) brandishing what appeared to be a firearm.  
            On January 11, 2018, YVSF officers viewed an eighth Snapchat video of the defendant in possession of a firearm.  Police then located the defendant seated in a sport utility vehicle (SUV) parked behind his residence.  After removing the defendant from the SUV, officers found a .40 caliber Smith and Wesson pistol loaded with twenty-six rounds tucked into his waistband.  
            While released on bail for the January 2018 gun offense, the defendant was again spotted on a Snapchat video on May 11, 2018, in possession of what appeared to be a firearm.  Hours later, officers tracked the defendant to a location outside his residence.  A pat frisk resulted in the seizure of a loaded nine millimeter Ruger handgun with an obliterated serial number equipped with a large capacity magazine.  In June 2018, a grand jury returned indictments charging the defendant with two counts of unlawful possession of a firearm and related firearm offenses.[3]  
            From 2018 to 2021, the defendant filed three discovery motions seeking to develop a factual basis for an equal protection challenge to the BPD's use of undercover social media monitoring.  First, on October 31, 2018, the defendant moved for "selective prosecution" discovery of information concerning the alleged discriminatory use of "'Snapchat' as an investigatory tool."  More particularly, the defendant sought police reports generated by the BPD from June 1, 2016, to October 1, 2018, "for investigations that involve the use of 'Snapchat' social media monitoring."  The discovery request excluded investigations "where the police have not yet arrested and charged the suspect" and proposed a protective order limiting the sharing of any information gleaned from the reports beyond statistical data about the race of targeted individuals.  
            In support, the defendant submitted an affidavit from his attorney stating that counsel had conducted an "informal survey" of the defense bar responsible for roughly one-quarter of cases prosecuted in Suffolk County.  The questions included, "if lawyers had 'Snapchat' cases, what the race of the defendant was, and whether the defendant was the person being targeted by the investigation."  Counsel received responses identifying twenty such cases; of those cases, seventeen defendants (eighty-five percent) were Black and three (fifteen percent) were Hispanic.  
            A Superior Court judge allowed the defendant's motion for selective enforcement discovery limited to police reports referencing the use of Snapchat as an investigatory tool for a one-year time period between August 1, 2017, and July 31, 2018.  The order, issued on January 18, 2019, excepted ongoing investigations and investigations related to human trafficking, murder, and sexual assault.  Recognizing that the reduction of gun violence in Boston is an important law enforcement priority and that undercover social media monitoring is "a valuable law enforcement tool," the judge nonetheless found that the defendant made an initial statistical showing of racial disparity under the then-existing Lora framework.  See Lora, 451 Mass. at 436-437. 
            The Commonwealth sought interlocutory review under G. L. c. 211, § 3, and filed a motion to stay discovery pending appeal.  In its petition, the Commonwealth argued that the judge erred in concluding that the defendant had met his initial burden of demonstrating a viable selective enforcement claim.  Commonwealth v. Dilworth, 485 Mass. 1001, 1002-1003 (2020).  A single justice denied the petition on the basis that the matter did not warrant the exercise of the court's extraordinary authority under G. L. c. 211, § 3.  Dilworth, supra at 1002.  On appeal pursuant to S.J.C. Rule 2:21, as amended, 434 Mass. 1301 (2001), the full court affirmed the single justice's order without reaching the merits of the equal protection issue.  Dilworth, supra at 1003.  
            After our decision, the Commonwealth complied with the January 2019 order by producing twenty-one police reports from a one-year time period relating to individuals arrested with firearms as a result of Snapchat monitoring.  The reports did not identify the targets of the investigation by race or other demographic information.
            Second, on January 13, 2021, the defendant filed a motion for "equal protection discovery" based on Long, 485 Mass. at 724-725, which was decided during the pendency of the discovery litigation.  The defendant moved for discovery of social media investigations, to include any lists or spreadsheets of individuals being monitored by members of the YVSF, notice of the total number of individuals monitored, and documentation of any other arrests or search warrant executions that were based on Snapchat monitoring by the YVSF or BPD.  The Commonwealth opposed the motion for additional social media discovery, arguing that Long only applied to traffic stops.  
            Finding information related to the BPD's investigatory use of social media relevant and material to the defendant's equal protection claim, another Superior Court judge allowed portions of the discovery motion.  He reasoned that information about individuals who were monitored, but never charged, would "provide statistical evidence based on a greater number of data points that may support or dispel the requisite inference [of racial profiling]."  The judge further ordered the Commonwealth to review any reports, booking sheets, videos, screenshots, or other documentation of those monitored on Snapchat between August 1, 2017, and July 1, 2018, and disclose each individual's perceived race.  
            Third, on May 7, 2021, the defendant requested "[c]olor copies of the user icons or bitmojis, and the user names, for the fake Snapchat accounts used by officers in the [gang unit] between August 1, 2017[,] and July 31, 2018, including but not limited [to] the account(s) used to monitor [the defendant]."  As grounds for this request, the defendant represented the following:
"The race and skin tone and hair color and style that the officers chose to use as their 'undercover' for the fake Snapchat accounts they set up will demonstrate the demographics of the groups they are trying to infiltrate.  The [e]qual [p]rotection challenge here deals with the patterns of decisions police made from the outset of an investigatory scheme, and how those patterns of decisions reflect a choice to target people based on race.  The user images, and the names of those accounts, are relevant and necessary pieces of evidence in this litigation, and the selection of those user images by officers is one of the first exercises of selectivity that the police made with this investigatory scheme that documented the race of the people they are going to target."  (Citation omitted.)  
In opposition, the Commonwealth continued to challenge the validity of the defendant's right to equal protection discovery and asserted that governmental interests, "akin" to those recognized in the surveillance location and confidential informant privileges, shielded the requested information from disclosure.  On June 24, 2021, a judge allowed the defendant's discovery motion, determining that neither privilege barred disclosure.  
            Six months later, the Commonwealth filed a motion to reconsider the order compelling disclosure of Snapchat usernames and profile images, raising identical objections to the discovery.  This time the Commonwealth attached an undated and unsigned affidavit from YVSF Detective Brian Ball "explaining why disclosure of this information would cause irreparable damage to the Commonwealth's substantive right and privilege to prevent disclosure of its confidential informants and surveillance locations used in criminal investigations."  Ball, in sum, detailed the value of a proactive investigative technique targeting "individuals believed to be active in firearm activity and gang related violence."  "This [had] led to the recovery of hundreds of firearms from individuals known to carry out acts of violence."  Ball stated that officers utilize social media posts to corroborate information gained from confidential informants as accurate and truthful.  He opined that "[t]he disclosure of [a] social media account . . . would allow the target of the investigation the ability to narrow down the inevitable list of individuals believed to have cooperated with law enforcement."  Further, the disclosure of an undercover username "would undoubtedly render that account useless in future investigations," severely hampering the ability of law enforcement to investigate violent crime or prevent future acts of violence.  
            The judge denied the Commonwealth's motion to reconsider.  On February 3, 2022, the Commonwealth again filed a petition in the county court pursuant to G. L. c. 211, § 3, which was denied summarily by a single justice.  On May 24, 2022, the Commonwealth filed its notice of noncompliance, asserting that compliance would put the safety of confidential informants and police officers at risk, the defendant legally had suffered no prejudice due to his inability to establish an equal protection violation, and the "defendant [had] been provided with an abundance of discovery which could be used to attempt to meet his burden for an equal protection motion."  The BPD also filed a notice of noncompliance representing that "[c]ompliance with the [c]ourt's order to disclose all bitmoji and usernames of [BPD] undercover [Snapchat] accounts would bring about the end of the use of one of the most effective investigative techniques the [BPD] has in combating firearm[] violence . . . .  What is more, the disclosure . . . could jeopardize the safety of both officers and confidential informants."  
            The defendant filed a motion to dismiss with prejudice based on the Commonwealth's failure to comply with the June 2021 discovery order.  After a hearing, a Superior Court judge dismissed the case with prejudice to sanction the Commonwealth for its discovery violation.  He recognized that dismissal is a remedy of last resort "because it precludes a public trial and terminates criminal proceedings."  The judge, however, considered the Commonwealth's "deliberate non-compliance to be an egregious discovery violation" based on its unwillingness to offer realistic alternative remedies such as redacted disclosures, in camera review, or the use of protective orders.  To the extent that the Commonwealth raised concerns about compromising ongoing investigations, the judge found that the Commonwealth had "neither factually supported this argument nor taken any of the measures available to protect such information."  Similarly, the Commonwealth's argument that disclosure would imperil the safety of undercover officers or informants lacked factual support, and the Commonwealth did not offer to submit information in camera or by using "generic, protective language, or redactions."  "Without factual information, this [c]ourt cannot accept the argument that revealing anything about icons, bitmojis and user names deployed by the BPD four-to-five years ago would imperil the safety of confidential informants and/or undercover officers and impede ongoing investigations" (emphasis in original).  The judge concluded that the Commonwealth had "given the [c]ourt no reasonable alternative to dismissal." 
            2.  Discussion.  The Commonwealth contends that dismissal was not an appropriate sanction for its refusal to comply with the June 2021 discovery order for three reasons.  First, the judge applied the wrong legal standard to the defendant's equal protection discovery request.  Second, the username and profile images associated with the undercover Snapchat account are privileged because disclosure would jeopardize ongoing investigations and endanger confidential informants.  Third, the judge's order dismissing the indictments with prejudice constituted an abuse of discretion.  
            a.  Equal protection standard.  We begin with the Commonwealth's argument that the judge erred in applying the Long equal protection standard.  This raises a question of law subject to de novo review.  See Commonwealth v. Hebb, 477 Mass. 409, 411 (2017).    
            A brief background on the tripartite and Long equal protection standards is necessary to provide context for our discussion.  The tripartite test applies to claims of selective prosecution "which occur when, from among the pool of people referred by police, a prosecutor pursues similar cases differently based on race or another protected class" (quotation and citation omitted).  Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 19 (2023).  See Commonwealth v. Bernardo B., 453 Mass. 158, 173 (2009) (selective prosecution claim arose from district attorney's practice of declining to bring statutory rape charges against female complainants).  The tripartite test requires the defendant to establish that (1) a broader class of persons than those prosecuted violated the law; (2) the failure to prosecute was either consistent or deliberate; and (3) the decision not to prosecute was based on an impermissible classification, such as race, religion, or sex.  See Commonwealth v. Franklin Fruit Co., 388 Mass. 228, 230 (1983).   
            The court, in Long, 485 Mass. at 715, revised the traditional, and more rigorous, tripartite equal protection standard in a case involving an alleged discriminatory law enforcement practice.  See generally Robinson-Van Rader, 492 Mass. at 18-20 (discussing differences between selective prosecution and selective enforcement for equal protection claims).  We determined, as a matter of State constitutional law, that the tripartite test "placed too great an evidentiary burden on defendants" seeking to challenge discriminatory traffic stops.  Long, supra at 721.  It is the defendant's burden under the new Long standard "to demonstrate that the decision to make a traffic stop was motivated by race or another constitutionally protected class."  Robinson-Van Rader, supra at 17.  This requires the defendant to produce evidence "upon which a reasonable person could rely to infer that the officer discriminated on the basis of the defendant's race or membership in another protected class" (citation omitted).  Id.  The burden then shifts to the Commonwealth to rebut the inference of discriminatory law enforcement "by establishing a race-neutral reason for the stop."  Id.  In Robinson-Van Rader, the court also held that the Long equal protection standard applies beyond traffic stops to claims of selective law enforcement, such as pedestrian threshold inquiries and "other claims of discriminatory law enforcement practices."  Id. at 18.  
            In support of its argument that the defendant should be held to the tripartite standard, the Commonwealth points out that this court has not articulated, beyond traffic stops and pedestrian threshold inquiries, what "other claims of discriminatory law enforcement practices" are likewise covered.  Snapchat monitoring, the Commonwealth argues, "is decidedly not the type of police investigatory practice contemplated by Robinson-Van Rader."  The action of a police officer sending a social media friend request to a suspect, who voluntarily accepts it, "is a far cry from 'police investigatory practices' such as motor vehicle and pedestrian stops which involve a physical intrusion on a defendant's person and privacy rights."  
            The legal significance of the nonintrusive nature of covert social media monitoring, the Commonwealth maintains, is bolstered by our decision in Commonwealth v. Carrasquillo, 489 Mass. 107 (2022).  In Carrasquillo, we held that a defendant failed to meet his burden, under art. 14 of the Massachusetts Declaration of Rights, of demonstrating a subjective or objective expectation of privacy in a Snapchat account readily shared with an undercover police officer.  Id. at 120, 124.  Applying Carrasquillo to this case, the argument goes, the defendant was required to establish an expectation of privacy in his Snapchat account prior to receiving equal protection discovery. 
            We reject the Commonwealth's view of what types of police investigatory practices are subject to the revised Long equal protection framework.  The Long standard applies to alleged discriminatory policing in the investigatory phase of a case.  See Robinson-Van Rader, 492 Mass. at 20-21 ("street-level" investigations).  It encompasses a claim that the police monitored social media accounts based on the target's race or membership in another protected class.   
            Carrasquillo does not help the Commonwealth's cause.   Grafting a search or seizure requirement onto a selective enforcement claim conflates separate rights secured by the Fourth Amendment to the United States Constitution or art. 14 and the equal protection clause of the Fourteenth Amendment to the United States Constitution or its cognate provisions under the Massachusetts Declaration of Rights.  "[T]he Federal and State constitutional guarantees of equal protection of the laws provide residents of the Commonwealth a degree of protection separate and distinct from the prohibition against unreasonable searches and seizures under the Fourth Amendment and art. 14."  Robinson-Van Rader, 492 Mass. at 22.  The equal protection clause "does not fit neatly" into the various stages of search and seizure analysis (citation omitted).  Id. at 23.  "The heart of the equal protection clause is its prohibition of discriminatory treatment.  If a government actor has imposed unequal burdens based upon race, it has violated the clause" (citation and alterations omitted).  Id.  A physical intrusion, akin to a traffic stop or threshold inquiry, is not required.  See Long, 485 Mass. at 758 (Cypher, J., concurring) (race-based decision to query license plates prior to traffic stop impermissible on equal protection grounds).  
            Accordingly, the judge properly applied the less stringent Long equal protection standard, under arts. 1 and 10 of the Massachusetts Declaration of Rights, to the defendant's discovery request.  
            b.  Privilege to withhold identifying information.  Next, we consider whether the Commonwealth properly asserted a privilege shielding the Snapchat account usernames and profile images of undercover BPD officers from disclosure.  The Commonwealth contends that it raised two legitimate governmental interests, recognized in the surveillance location and confidential informant privileges, justifying nondisclosure:  first, that disclosure of undercover usernames or profile images would compromise ongoing criminal investigations; and, second, that unmasking these undercover social media accounts would endanger confidential informants.  The burden then shifted, the Commonwealth argues, to the defendant to demonstrate a need for the information.[4]  
            The judge determined that the "informant and surveillance location privileges are not directly applicable to electronic surveillance of the type apparently employed to watch Snapchat postings."  He reasoned:  "[T]he police technique of secretly infiltrating Snapchat accounts is an infinitely renewable resource, spoiling one electronic 'surveillance location' -- or a series of fictional identities used three to four years ago -- does not prevent the police from creating any number of others."  Additionally, he found that the Commonwealth did not establish that disclosure of usernames or profile images raises "a concern with the physical safety of an informant or of police officers." 
            The judge did not abuse his discretion in finding that the Commonwealth failed to properly assert a privilege justifying nondisclosure in this case.  See Commonwealth v. Whitfield, 492 Mass. 61, 67 (2023) (decision on privilege reviewed for abuse of discretion).  We are not, however, prepared to go as far as the motion judge, and say that the Commonwealth is precluded categorically from asserting a privilege to withhold social media account usernames or profile images used by undercover officers.  Rather, on these facts, the Commonwealth did not satisfy its burden.  
            To start, we hold that undercover usernames and profile images may be privileged where their disclosure would compromise ongoing criminal investigations.  Massachusetts appellate courts, in the context of the surveillance location and confidential informant privileges, have recognized the government's legitimate interest in shielding ongoing criminal investigations from disclosure.  Commonwealth v. Lugo, 23 Mass. App. Ct. 494, 498 (1987), cited with approval in Commonwealth v. Lugo, 406 Mass. 565, 570 (1990) ("Just as the disclosure of an informer's identity may destroy his future usefulness in criminal investigations, the identification of a hidden observation post will likely destroy the future value of that location for police surveillance" [citation omitted]).  See United States v. Green, 670 F.2d 1148, 1155 (D.C. Cir. 1981) (hidden observation posts are valuable law enforcement tool as long as they remain hidden).  See also United States v. Cintolo, 818 F.2d 980, 1002 (1st Cir.), cert. denied, 484 U.S. 913 (1987) (law enforcement privilege precludes disclosure of confidential information concerning placement of electronic surveillance devices).
            The defendant, in the early stages of discovery, did not dispute that the Commonwealth had an interest in shielding ongoing criminal investigations from disclosure.  Filed five months after his arrest, the defendant's selective enforcement discovery request excluded by agreement police reports for "investigations where the police have not yet arrested and charged the suspect."  The January 2019 discovery order, in turn, limited the scope of discovery "to exclude documents related to ongoing investigations."
            Later, in 2021, the Commonwealth asserted a privilege of nondisclosure for usernames and profile images "used by officers in the [gang unit] between August 1, 2017[,] and July 31, 2018."  In its opposition, filed on June 1, 2021, the Commonwealth asserted that disclosure would thwart ongoing investigations without factual support.  It then faulted the defendant for failing to demonstrate an exception to that privilege.  Ball's subsequent affidavit offered a conclusory opinion that disclosure "would instantly jeopardize other investigations" and "undoubtedly render that account useless in future investigations."
            The record supports the judge's finding that the government did not establish a legitimate interest in the preservation of undercover social media accounts created three to four years ago.  In short, there was no showing of a legitimate need to protect an ongoing investigation.[5]  See Commonwealth v. Bonnett, 472 Mass. 827, 847 (2015), S.C., 482 Mass. 838 (2019) (scope of privilege limited by its underlying purpose). 
            We next turn to the issue whether the Commonwealth properly asserted an "equivalent" confidential informant privilege applicable to undercover social media accounts.  It is the Commonwealth's burden, in this stage of discovery, to demonstrate that disclosure of an informant's identity "would endanger the informant or otherwise impede law enforcement efforts."  Bonnett, 472 Mass. at 846-847, quoting Roviaro v. United States, 353 U.S. 53, 60 (1957).  See Commonwealth v. Gandia, 492 Mass. 1004, 1007 (2023) (Commonwealth asserted informant privilege "where it raised sufficient concern for the safety of the informant should his or her identity be disclosed and it asserted that revealing the identity of the informant would have a chilling effect on such informants in other cases making it unlikely that they would continue to participate in investigations" [quotations omitted]); Commonwealth v. D.M., 480 Mass. 1004, 1005 (2018) (Commonwealth asserted informant privilege where it alleged that disclosure of identity of informant would endanger person associated with defendant).  
            The Commonwealth contends that disclosure of usernames and profile images of undercover officers is "tantamount" to the disclosure of the identities of multiple confidential informants, the result of which, the Commonwealth argues, is an inevitable risk of danger.  This theory, explained in Ball's affidavit, is as follows:  "[i]t is increasingly common" to use information gained from informants or undercover police officers; police use information gathered through social media surveillance to corroborate their informants as "accurate and truthful"; informants risk retaliation from gang members; and the disclosure of usernames and profile images "would allow the target of the investigation the ability to narrow down the inevitable list of individuals believed to have cooperated with law enforcement."
            Because the comparison is unpersuasive, there was ample basis for the judge to conclude that the Commonwealth did not properly assert an "equivalent" confidential informant privilege.  The use of undercover social media accounts to monitor suspected criminal activity does not necessarily involve confidential informants.  As such, there may be no confidential informant to protect.  Additionally, disclosure of an undercover  social media account does not risk chilling public participation in law enforcement because the public does not participate in the deception.  Finally, to the extent that danger lurks in the ability of a defendant to ascertain the identity of an informant through cross-referencing usernames or profile images with other information, the Commonwealth failed to establish a nexus between disclosure of the requested information (usernames and profile image used by the BPD between August 1, 2017, and July 31, 2018) and potential danger to a confidential informant.  
            c.  Dismissal with prejudice.  "There is no question . . . that, on failure of the Commonwealth to comply with a lawful discovery order, [a] judge may impose appropriate sanctions, which may include dismissal of the criminal charge[s]."  Commonwealth v. Douzanis, 384 Mass. 434, 436 (1981).  See Mass. R. Crim. P. 14 (c) (1), as appearing in 442 Mass. 1518 (2004).  Still, sanctions must be remedial rather than punitive in nature, "aimed at curing any prejudice caused by the violation of a discovery obligation and ensuring a fair trial."  Commonwealth v. Carney, 458 Mass. 418, 428 (2010).  Furthermore, "dismissal of a criminal case is a remedy of last resort because it precludes a public trial and terminates criminal proceedings."  Commonwealth v. Washington W., 462 Mass. 204, 215 (2012), quoting Commonwealth v. Cronk, 396 Mass. 194, 198 (1985).  See Commonwealth v. Lam Hue To, 391 Mass. 301, 314 (1984) ("Such a drastic remedy would be appropriate where failure to comply with discovery procedures results in irremediable harm to a defendant that prevents the possibility of a fair trial").  We accept a judge's findings of fact absent clear error and review discovery sanctions for abuse of discretion or other error of law.  Carney, supra at 425.    
            Here, the judge weighed other available options before concluding that dismissal was an appropriate sanction.  He noted that the Commonwealth and BPD had not "made any attempt to comply with the June 2021 [o]rder" and had "expressly stated that they [did] not intend to comply."  Nor did the Commonwealth offer to disclose redacted copies of the discovery or submit an in camera affidavit detailing the specific threats posed by disclosure.  The judge found that the Commonwealth did not take "any of the measures available to protect such information consistent with seeking to comply with a court order."     
            Instead, the Commonwealth offered an alternative to dismissal that turned the discovery violation on its head.  It proposed that the court disregard the June 2021 order and allow the case to go forward without the requested discovery to a hearing on the merits of the equal protection claim.  On conviction, the defendant would be able to raise on appeal the Commonwealth's failure to provide the court-ordered discovery.  The judge appropriately rejected this alternative remedy, concluding "the [c]ourt should not and will not allow the case to proceed as if the June 2021 [o]rder never issued."  
            Our decision in Washington W., 462 Mass. at 204, is instructive.  There, the court ordered the Commonwealth to provide statistical data concerning the prosecution of juvenile sexual assault charges to establish a potential selective prosecution claim.  Id. at 206-208.  The Commonwealth refused to provide the information.  Id. at 207-208.  This court affirmed the motion judge's dismissal with prejudice.  Id. at 216-218.  "The . . . right to a fair trial . . . included the right to develop the factual basis necessary to support [a] claim of selective prosecution, and the prosecutor's refusal to comply with the judge's discovery order essentially denied him the opportunity to evaluate and present this claim."  Id. at 216.  See Commonwealth v. Cuffee, 492 Mass. 25, 30 (2023) (defendant asserting equal protection claim entitled to discretionary discovery on threshold showing of relevance); Commonwealth v. Betances, 451 Mass. 457, 462 n.6 (2008) (same).  
            The record supports the judge's finding that the Commonwealth, above all, sought appellate review of the June 2021 order requiring disclosure of information related to, as the Commonwealth perceived it, a nonintrusive investigatory practice.  Acknowledging that the Commonwealth raised substantive issues of first impression, the judge stated:  "It appears that the Commonwealth wishes to have these arguments heard sooner rather than later.  The [c]ourt understands the Commonwealth's interest in having the Appeals Court or SJC resolve these issues."  By dismissing the indictments, the judge gave the Commonwealth what it was looking for -- the opportunity to litigate these issues "sooner rather than later" before this court.  Accordingly, there was no abuse of discretion.  
            Order allowing motion to dismiss affirmed. 
footnotes

            [1] We acknowledge the amicus briefs in support of the defendant jointly submitted by the Massachusetts Association of Criminal Defense Lawyers and the Criminal Justice Institute at Harvard law School; and jointly submitted by the American Civil Liberties Union of Massachusetts, Inc., the Innocence Project, Inc., Dr. Michael G. Bennett, and Dr. Zahra Stardust.
            [2] Snapchat, a social media application, "allows users to share text, photographs, and video recordings, collectively known as 'snaps.'"  Commonwealth v. Carrasquillo, 489 Mass. 107, 108 (2022).  On Snapchat, a user's profile picture -- an image that is "used to identify a particular social media user's account" and typically "accompanies any content that [the user] posts" -- does not need to be a photograph of the actual user.  Id. at 110 n.6.  Instead, Bitmoji, another social media application, "allows users to create personalized 'avatars'" that function as user profile pictures on Snapchat.  Goldman, Emojis and the Law, 93 Wash. L. Rev. 1227, 1236 (2018).  To simplify, we refer to the "user icons or bitmojis, and other user names" discussed in this case as profile images and usernames.  
            [3] The grand jury returned a total of nine indictments against the defendant:  two counts of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (a); two counts of unlawful possession of ammunition, in violation of G. L. c. 269, § 10 (h); two counts of unlawful possession of a loaded firearm, in violation of G. L. c. 269, § 10 (n); two counts of unlawful possession of a large capacity feeding device, in violation of G. L. c. 269, § 10 (m); and a single count of receiving a firearm with a defaced serial number, in violation of G. L. c. 269, § 11C.  
            [4] A successful assertion of privilege is not the end of the inquiry.  "[I]f the Commonwealth . . . has asserted [a] . . . privilege, the defendant may request that the privilege be set aside on the grounds that it 'interferes with a fair defence'" (citation omitted).  Commonwealth v. Bonnett, 472 Mass. 827, 847 (2015).  See Commonwealth v. Whitfield, 492 Mass. 61, 69 (2023) (defendant required to articulate basis for judge to assess materiality and relevance of disclosure to defense). 
            [5] The judge also found that the threat to ongoing investigations was diminished by the ability of police to secretly infiltrate Snapchat accounts by inventing new electronic identities.  In this way, he reasoned, police may continue to monitor the same account utilizing "an infinitely renewable resource" of fictitious usernames.  We leave this issue for another day -- the record does not disclose whether police, imbedded in a target's social media account, are able to continue effectively monitoring the account once the individual is tipped off that a "friend" is really an undercover police officer.